IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GMAC REAL ESTATE, LLC,                      )
                                            )
          Plaintiff,                        )        FILED: JULY 11, 2008
                                            )        08CV3950
vs.                                         )   No.  JUDGE ZAGEL
                                            )        MAGISTRATE JUDGE COLE
SIGNATURE REALTY & DEVELOPMENT,             )        EDA
INC., d/b/a SIGNATURE and d/b/a             )
SIGNATURE REAL ESTATE, and M. SUSAN         )
McINTYRE,                                   )
                                            )
          Defendants.                       )

## MOTION FOR CONFIRMATION OF ARBITRATION AWARD AND JUDGMENT

Plaintiff and Claimant in the underlying arbitration GMAC Real Estate, LLC ("GMAC") by its attorney Eric R. Lifvendahl, moves this Court to confirm the arbitration award entered on July 9, 2008 by the American Arbitration Association ("AAA") and enter judgment on behalf of GMAC pursuant to Federal Arbitration Act, §9. In support of its motion, GMAC states as follows:

1.    GMAC and Defendants (also the named Respondents in the arbitration) Signature Realty & Development, Inc. d/b/a Signature and d/b/a Signature Real Estate ("Signature"), and M. Susan McIntyre ("McIntyre") entered into ten (10) Franchise Agreements for ten separate real estate offices in Florida. Each agreement has identical terms and all reference the agreement for the location at 4700 Millenia Blvd., Orlando, Florida as the master or controlling agreement ("Millenia Agreement"). A copy of the Millenia Agreement is attached hereto as Exhibit A.

2.    Pursuant to Section 23 of all the Franchise Agreements, the parties agreed that any dispute would be resolved by arbitration before the AAA in Chicago. (Ex. A, §23B, p. 23).

The parties also agreed that the arbitration would be governed by the Federal Arbitration Act and any judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

3.      Following a dispute over the Franchise Agreements GMAC filed an Arbitration Demand with AAA.  (A copy of the Demand without exhibits is attached as Exhibit B).  As stated in the Demand, GMAC's principal place of business is Illinois.

4.      On May 19 and 20, 2008, an arbitration hearing in Case No. 51 115 Y0127Y 07 was held in Chicago before the arbitrator Gary W. Leydig.

5.      On July 9, 2008, arbitrator Leydig issued an Award of Arbitrator ("Award").  (A copy of the Award is attached as Exhibit C).

6.      As states in the Award, defendant Signature was found in default of the agreements and liable to GMAC in the amount of $1,241,147.53.

7.      The Arbitrator determined that the amount owed by Signature must be reduced by any amounts owed by McIntyre to GMAC.

8.      As stated in the award, the Arbitrator found against McIntyre and in favor GMAC on Count III in the amount of $369,594.93.  As noted above, this amount must be subtracted from the award against Signature which reduces Signatures liability to $871,552.60 ($1,241,147.53 less $369,594.93).

9.      Lastly, the Award found Signature and McIntyre jointly and severally liable to GMAC for arbitration costs and fees as well as attorney's fees and costs totally $44,662.

10.     GMAC requests this Court enter an Order confirming the arbitration Award and entering judgment on behalf of GMAC.  Attached hereto is a draft proposed order confirming the arbitration Award and entering judgment on behalf of GMAC.

WHEREFORE, Plaintiff GMAC Real Estate, LLC respectfully requests the Court enter an Order confirming the arbitration Award entered by Arbitrator Gary Leydig on July 9, 2008 and entering judgment against both Defendants.

<div style="margin-left:40%">

Respectfully submitted,

GMAC Real Estate, LLC, Plaintiff


By:___/s/ Eric R. Lifvendahl_____
      One of its Attorneys

</div>

Eric R. Lifvendahl
Williams Montgomery & John Ltd.
20 North Wacker Drive
Suite 2100
Chicago, IL 60606
(312) 442-3200

Document #: 780130

08CV3950
JUDGE ZAGEL
MAGISTRATE JUDGE COLE
EDA

# EXHIBIT A

# GMAC REAL ESTATE, LLC

## REAL ESTATE FRANCHISE AGREEMENT

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4



# TABLE OF CONTENTS

**Page**

1.  THE FRANCHISE..................................................................................1

2.  RELATIONSHIP OF THE PARTIES...................................................1

3.  THE MARKS..........................................................................................2

4.  MATERIALS...........................................................................................4

5.  TRAINING...............................................................................................4

6.  GRANT OF THE LICENSE....................................................................5

7.  CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE; PROVISION OF OTHER SETTLEMENT SERVICES.......................6

8.  NO CONFLICTING LICENSE / INTEREST........................................7

9.  GROSS COMMISSION INCOME AND FEES / REAL PROPERTY............7

10. FEES.......................................................................................................8

11. PAYMENT OF FEES/REPORTING....................................................8

12. LATE PAYMENT..................................................................................10

13. VERIFICATION RIGHTS.....................................................................10

14. ADVERTISING FUND..........................................................................10

15. REFERRALS...........................................................................................12

16. PREMIER SERVICE$^{SM}$; PERFORMANCE STANDARDS......................13

17. ASSIGNMENT; OWNERSHIP; RIGHT OF FIRST REFUSAL..................14

18. TERMINATION; DEFAULT; CROSS-DEFAULT.............................17

19. OBLIGATIONS UPON TERMINATION..............................................19

20. REPRESENTATIONS AND WARRANTIES.......................................21

21. ENTIRE AGREEMENT..........................................................................22

22. INDEMNIFICATION AND INSURANCE...........................................22

23. CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS....................................23

24. MODIFICATION OF AGREEMENT....................................................24

25. SEVERABILITY....................................................................................24

26. NON-WAIVER........................................................................................24

27. NOTICES; FACSIMILE AND ELECTRONIC MAIL........................24

28. TERM AND RENEWAL.......................................................................25

29.   EFFECTIVE DATE...................................................................................26

30.   FRANCHISE DEVELOPMENT COSTS LOAN ............................................25

31.   LIMITATION OF DAMAGES/RELEASE. .....................................................26

32.   CONFIDENTIALITY OF AGREEMENT........................................................27

## EXHIBITS

Endorsement of Principals / Ownership Interest Holders
A     -     Royalty / Advertising Fees
B     -     Franchise Development Costs Note
C     -     Licensed Territory
D     -     Loan & Security Agreement
E     -     Existing Term Loan Note

## REAL ESTATE FRANCHISE AGREEMENT

The parties, GMAC Real Estate, LLC, a Delaware limited liability company, with its principal offices at 2021 Spring Road, Suite 300, Oak Brook, Illinois 60523 ("**GMAC Real Estate**"); and

| | |
|---|---|
| Signature Realty & Development, Inc. | dba Signature |
| Exact name under which real estate license is held ("**Strategic-Partner**"), whose principal place of business is located at 4700 Millenia Blvd., Suite 310, Orlando, FL 32839 | (any change in dba requires prior written approval) |

FEDERAL ID#59-2967179

agree as follows:

## 1. THE FRANCHISE.

GMAC Real Estate and its predecessors have developed a franchise system (the "**Franchise**") which will permit use of the Marks (as defined in Section 3), including the Mark "GMAC Real Estate", in the promotion and sale of Real Property (as defined in Section 9.C.). The Franchise provides those firms selected to be strategic-partners with the opportunity to use the Marks and to participate in the other benefits outlined in this Agreement.

GMAC Real Estate: (a) provides guidelines regarding the use of the GMAC Real Estate name and other Marks, which are intended to maximize the value of the nationally recognized image of GMAC Real Estate and improve the effectiveness of Strategic-Partner's advertising, public relations, personnel recruiting and sales promotion programs; (b) facilitates referrals between strategic-partners (but excluding referrals from GMAC Real Estate's affiliated relocation company, unless Strategic-Partner and/or Strategic-Partner's sales associates have qualified for such referrals, and then, subject to the conditions of such qualification); (c) provides systems and programs to deliver sales training and education, management training and client promotional materials to its strategic-partners; and (d) periodically provides a national business conference for the benefit of its strategic-partners.

GMAC Real Estate will strive to improve the Franchise through development of new programs and review of existing programs and will seek recommendations from its strategic-partners to strengthen the Franchise at local and national levels.

## 2. RELATIONSHIP OF THE PARTIES.

GMAC Real Estate and Strategic-Partner are each independently owned and operated businesses which share similar mutual interests with respect to real estate brokerage. Neither this Real Estate Franchise Agreement (this "**Agreement**"), nor the use of the term "Strategic-Partner" in this Agreement, is intended to create or shall be construed to create an agency, partnership, joint venture or employer-employee relationship between the parties. The GMAC

Real Estate business operated by Strategic-Partner is an independently owned and operated business and Strategic-Partner is solely responsible for its day-to-day conduct and activities. Strategic-Partner is not an agent (actual, implied or ostensible) of GMAC Real Estate. Neither party shall hold itself out to be an agent, partner, joint venturer or employee of the other party. Neither party shall have the right to bind or obligate the other party.

Strategic-Partner agrees to conduct its real estate brokerage business: (a) in such fashion as to reflect favorably at all times on GMAC Real Estate and the good name, goodwill and reputation of GMAC Real Estate and the Marks, and (b) in compliance with all laws and regulations pertaining to the operation of its real estate brokerage business.

## 3. THE MARKS.

A. **Ownership and Modification of the Marks.**  GMAC Real Estate is the owner or licensee of the GMAC Real Estate trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols used to identify the products and services offered by GMAC Real Estate franchises, including the mark "GMAC Real Estate" (collectively the "Marks"). Strategic-Partner's right to use the Marks is derived solely from this Agreement and is limited to the operation of a real estate brokerage business by Strategic-Partner, pursuant to and in compliance with this Agreement and with all applicable standards, specifications and operating procedures prescribed by GMAC Real Estate, from time to time, during the term of this Agreement.  Any unauthorized use of the Marks by Strategic-Partner shall constitute a Default (as defined in Section 18.D.) of this Agreement and an infringement of the rights of GMAC Real Estate in and to the Marks.  GMAC Real Estate will protect and defend the Marks in the manner that it, in its sole discretion, determines is required.  All goodwill resulting from Strategic-Partner's use and promotion of the Marks will accrue to the benefit of GMAC Real Estate.

If it becomes advisable at any time, in the sole discretion of GMAC Real Estate, to modify or discontinue use of any Mark and/or to require Strategic-Partner to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols, Strategic-Partner agrees to comply with the requirements of GMAC Real Estate to modify or otherwise discontinue the use of such Mark and/or to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs or other commercial symbols after notice to do so from GMAC Real Estate.  All provisions of this Agreement applicable to the Marks shall apply to any other trademarks, service marks, trade dress, logos, designs, colors and commercial symbols later authorized by GMAC Real Estate, in writing, for use by and licensed to Strategic-Partner.  The term "Marks" shall include any marks developed and/or registered in the future.

GMAC Real Estate shall have no obligation to reimburse Strategic-Partner for any expenditures made by Strategic-Partner to modify or discontinue the use of a Mark or to adopt additions to or substitutes for a discontinued Mark, including, without limitation, any expenditures relating to advertising or promotional materials or to compensate Strategic-Partner for any goodwill related to the discontinued or modified Mark.  Notwithstanding the foregoing, if GMAC Real Estate changes the primary service mark of the Franchise so that it no longer includes the words "GMAC Real Estate" or some variation of those words, GMAC Real Estate will (a) provide Strategic-Partner 12 months' prior written notice of the change and (b) allow

Strategic-Partner to terminate this Agreement at the end of the twelve-month notice period. If Strategic-Partner elects to so terminate this Agreement, Strategic-Partner shall notify GMAC Real Estate, in writing, at least 90 days before the expiration of the 12-month notice period and shall comply with all post-termination obligations contained in this Agreement.

B.  **Use of Marks**.  To maintain the integrity of the Marks and the Franchise, GMAC Real Estate retains the right to control the quality of all materials and programs bearing the Marks and the manner in which the Marks are used.

The Marks shall be used: (1) only in conjunction with permanent real estate sales offices approved by GMAC Real Estate, and (2) only in the form and style authorized by GMAC Real Estate, as outlined from time to time in its manuals and other communications. Any departure from the restrictions set forth in the manuals or any use of the Marks on printed materials not outlined in the manuals must be approved in advance, in writing, by GMAC Real Estate. Use of the Marks on any publication (e.g., homeowner newsletter, decorating magazine, booklets, etc.) is specifically prohibited, unless the publication is approved in advance, in writing, by GMAC Real Estate.

Strategic-Partner will use the Marks in all real estate brokerage activities at or from the Licensed Site (as described in Section 6) during the term of this Agreement.

The Marks shall not be used to identify any property, goods or services provided by Strategic-Partner, other than those specifically approved, in writing, by GMAC Real Estate. Strategic-Partner will not use the Marks in any manner which indicates or implies the endorsement by GMAC Real Estate of any real property listed, sold or advertised by Strategic-Partner, including such real property's design, quality or price.

Strategic-Partner shall not use the GMAC Real Estate name or any other Mark as part of its corporate or entity name or in any other manner not expressly authorized, in writing, by GMAC Real Estate. The Marks shall be used as part of the trade name of Strategic-Partner in connection with all of, and limited to, its real estate brokerage activities. Strategic-Partner may use the GMAC Real Estate name (but not "GMAC" alone or any other Mark) as part of an Internet (or other computer network) domain name, provided that (i) such use complies with the standards set forth in the manuals or other communications supplied by GMAC Real Estate from time to time; (ii) prior written approval of the domain name is obtained from GMAC Real Estate; and (iii) upon termination of this Agreement for any reason, Strategic-Partner will comply with the terms of Section 19.A.(1) with regard to terminating its use of the GMAC Real Estate name as part of its domain name.

GMAC Real Estate reserves the right, in its sole discretion, to vary standards for any strategic-partner based upon the peculiarities or uniqueness of a strategic-partner's particular circumstances, business practices or any other conditions which GMAC Real Estate deems to require such variances. Strategic-Partner shall have no recourse against GMAC Real Estate for any variation from standard specifications and practices granted to any other strategic-partner and shall not be entitled to require GMAC Real Estate to grant Strategic-Partner a like or similar variation.

## 4. MATERIALS.

The use of any GMAC Real Estate materials (including copyrighted materials) is restricted to use by Strategic-Partner in its own business. Strategic-Partner shall not use for its own benefit (except as provided in this Agreement) or license to, or otherwise permit, third-parties to use or reproduce, in any form or manner, GMAC Real Estate materials or programs, or adapt and use, or permit any of its sales associates or employees to adapt and use, any GMAC Real Estate materials or programs on an Internet (or other computer network) site or in any other manner without the prior written approval of GMAC Real Estate.

All building signs, yard signs, promotional items and printed materials shall adhere to the design, size, colors and other specifications (together, the "**Specifications**") set forth in the manuals or other communications supplied by GMAC Real Estate from time to time. No departure from the Specifications shall be permitted without the prior written approval of GMAC Real Estate which approval shall not be unreasonably withheld, denied or delayed; any such departure shall be considered a Default of this Agreement. Strategic-Partner's Licensed Site shall be required to display building signs in conformance with the Specifications within sixty (60) days of the Effective Date. If a zoning ordinance, regulation, lease or similar restriction precludes Strategic-Partner from using a sign consistent with the Specifications, prior to erection of an alternate sign, the details for such an alternate sign shall be presented for approval to GMAC Real Estate, with a copy of the relevant zoning ordinance, regulation, lease or similar restriction; GMAC Real Estate's approval shall not be unreasonably withheld, delayed or conditioned.

All business records, letterheads, business forms, advertising and other materials (excluding business cards) disseminated to the public and used in Strategic-Partner's business shall indicate Strategic-Partner's independent ownership of the brokerage business with the statement "An Independently Owned and Operated Firm".

GMAC Real Estate will provide the initial development of a new logo treatment for Strategic-Partner, together with a franchise opening/starter kit, including operating and presentation manuals, videotapes, audio tapes, advertising materials, magazines and marketing products, at no cost to Strategic-Partner.

## 5. TRAINING.

A. **Getting Connected Session.** For New Strategic-Partners: GMAC Real Estate shall conduct a Getting Connected Session ("GCS") in the Chicago, Illinois area, or such other location designated by GMAC Real Estate. Strategic-Partner or its designated manager must attend, and satisfactorily complete, the first available GCS after execution of this Agreement. GMAC Real Estate will pay the GCS registration fee for one attendee (either Strategic-Partner or its designated manager) to attend a GCS at the site selected by GMAC Real Estate, provided that such designated person attends the GCS within 12 months after the Effective Date. Strategic-Partner may elect to have additional persons attend a GCS, but it must pay the then-current GCS registration fee for each additional attendee.

For Renewing Strategic-Partners: Within six (6) months after renewal, Strategic-Partner shall send at least one key management representative to a GCS at a site designated by GMAC Real Estate. The representative must complete the GCS to GMAC Real Estate's reasonable satisfaction. Strategic-Partner must pay the GCS registration fee for its designated representative and for each additional attendee.

B. **Accountability in Management.** For both new and renewing Strategic-Partners, following the Effective Date at least one key management representative of Strategic-Partner must satisfactorily complete "Accountability in Management" training. Upon any subsequent changes in key management personnel at the Licensed Site, at least one key management representative must satisfactorily complete Accountability in Management training. Accountability in Management training is a week-long management training class currently provided by a third-party vendor. Strategic-Partner must pay the Accountability in Management training registration fee for each attendee.

C. **Premier Service**SM. Strategic-Partner and each of its managers and sales associates must satisfactorily complete Premier Service training within six (6) months following the later to occur of (i) the Effective Date or (ii) such individual first becoming associated with Strategic-Partner. Strategic-Partner must pay the registration fee for each attendee.

D. **Costs.** Strategic-Partner shall be responsible for all travel, living and other costs its attendees incur in association with attending the training programs described in Sections A, B, and C above and all other training programs.

6. **GRANT OF THE LICENSE.**

A. **Current Office.** Strategic-Partner represents that it presently operates, or will by the Effective Date operate, an office at the following location:

Location    4700 Millenia Blvd., Suite 310, Orlando, FL 32839
_____
_____

GMAC Real Estate grants to Strategic-Partner an exclusive license to establish and/or operate a residential real estate brokerage office displaying the Marks at its existing office location, as set forth above (the "**Licensed Site**") and within its Licensed Territory (the "**Licensed Territory**") as described in Exhibit C, attached to this Agreement (the "Licensed Territory"). The continuance of Strategic Partner's exclusivity in the Licensed Territory is conditioned upon Strategic-Partner meeting the Performance Standards relative to the Licensed Territory, as set forth later in this Agreement and in Exhibit C.

Simultaneously with the execution of this Agreement, Strategic-Partner shall execute and deliver to GMAC Real Estate a written instrument, conveying to GMAC Real Estate Strategic-Partner's rights to any telephone numbers relating to the Licensed Site. GMAC Real Estate agrees that it will hold the instrument in escrow, and will not release the instrument or exercise its rights thereunder unless and until there exists an Event of Default under this Agreement.

B. **Additional Offices.**  If Strategic-Partner desires to expand its real estate brokerage business, by opening an additional office or otherwise, it shall apply to GMAC Real Estate for approval to do so, by submitting a written application at least ninety (90) days prior to the planned date for opening.  Approval of such expansion shall be within GMAC Real Estate's sole discretion and, if granted, shall be in writing.  If approved, Strategic-Partner and GMAC Real Estate will enter into a separate agreement, on the form then being offered by GMAC Real Estate, with regard to the new office. .  Any additional offices opened by Strategic-Partner within the first five (5) years following the Effective Date of this Agreement will be coterminous with this Agreement.  Strategic-Partner's application must be accompanied by payment of the applicable Joining Fee for the additional franchise.  If the office expansion is not approved by GMAC Real Estate, the Joining Fee will be refunded

C. **Sublicensing Prohibited.**  Strategic-Partner shall not sublicense, or permit a third-party to use, the GMAC Real Estate name or any other Mark.

7. **CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE; PROVISION OF OTHER SETTLEMENT SERVICES.**

A.  Nothing in this Agreement shall preclude Strategic-Partner or other strategic-partners from listing, selling or advertising any real estate, wherever it or the owner of the real estate may be located, including in areas serviced by Strategic-Partner or other strategic-partners, as applicable.  GMAC Real Estate reserves the right:  (i) to license other real estate brokers to use the Marks anywhere, other than at Strategic-Partner's Licensed Site, including areas adjacent to, or in proximity with, the Licensed Site; (ii) for GMAC Real Estate and its parents, subsidiaries, or affiliated entities to conduct activities, including real estate brokerage activities, mortgage, title insurance and relocation operations, in areas adjacent to, or in proximity with, the Licensed Site under the Marks or other marks; and (iii) for GMAC and its parents, subsidiaries, or affiliated entities to establish other franchises or company-owned outlets or other channels of distribution, selling or leasing similar products or services under a different mark.  Additionally, GMAC Real Estate reserves the right to establish, and to have its parents, subsidiaries and/or affiliated entities establish, anywhere, franchises or company-owned businesses or other channels of distribution:  (x) selling or leasing similar products or services under trademarks, service marks, trade dress, logos, designs, colors or other commercial symbols different from the Marks, or (y) offering dissimilar products or services under the Marks.

B.  Simultaneously with the execution of this Agreement, Strategic-Partner will enter into exclusive contractual relationships with GMAC Real Estate or its affiliates or designees pertaining to the delivery of other core real estate settlement services and/or products, including mortgage, title and closing services, home warranty and homeowner's insurance, provided, however, that both Strategic-Partner and GMAC Real Estate agree that the entry into such contractual relationships is beneficial to both parties.  If Strategic-Partner does not enter into one or more of these contractual relationships with GMAC Real Estate or its affiliates as of the Effective Date, but subsequently decides during the Term of this Agreement to provide any such core real estate settlement services and/or products, Strategic-Partner agrees that it must do so exclusively through the entry into contractual relationships with GMAC Real Estate or its affiliates or designees, as to those services and/or products.  Except for arrangements that Strategic-Partner has in place which pre-date the Effective Date, Strategic-Partner and its

Owners and affiliates may not directly or indirectly offer any such core real estate settlement services and products of other vendors, and may not have relationships with other vendors of such services and products, during the Term of this Agreement. Any existing arrangements which are to be excluded from this requirement will be noted in writing before this Agreement is signed.

## 8. NO CONFLICTING LICENSE / INTEREST.

During the period beginning on the Effective Date and ending on the last day of the Term, neither Strategic-Partner nor any of its principals or ownership interest holders (together, **"Owners"**), directly or indirectly, shall become affiliated with, establish or have an interest in: (a) any real estate brokerage franchising or similar system or service, other than one operated by GMAC Real Estate; (b) any real estate brokerage operation or business or real estate information center, which is not licensed by GMAC Real Estate; or (c) any business offering real estate settlement services and/or products including those described in Section 7.B. above, except in accordance with the provisions of Section 7.B. above. The provisions of this Section 8: (y) shall remain in effect through the last day of the Term, even if Strategic-Partner attempts to voluntarily terminate this Agreement or ceases operations or if this Agreement is terminated as the result of an Event of Default attributable to Strategic-Partner; or (z) shall have no further effect if this Agreement is terminated as the result of a Event of Default attributable to GMAC Real Estate.

## 9. GROSS COMMISSION INCOME AND FEES / REAL PROPERTY.

A. Gross Commission Income, as defined below and where applicable, shall be used as the basis for the calculation of fees to be paid by Strategic-Partner to GMAC Real Estate.

B. **"Gross Commission Income"** (**"GCI"**) includes (A) all commissions and fees received by Strategic-Partner from the sale, lease, transfer or other disposition (including mergers and similar transactions) (each a **"Disposition"**) of Real Property (as defined below), including any note, obligation, lien or other consideration given to Strategic-Partner in lieu of a commission, less commissions and referral fees paid to cooperating and/or referring brokers in other brokerage entities, but excludes (B) all commissions and fees received by Strategic-Partner from property management, the Disposition of commercial real estate or the non-residential portion of farm properties and any other brokerage or similar activity, provided Strategic-Partner conducts such activities through a separate legal entity (with a Federal I.D. number different from Strategic-Partner's), which entity maintains its own office location and telephone number and does not use the Marks. Specifically: (X) GCI includes any selling bonuses, document preparation fees, administration and similar fees received by Strategic-Partner; (Y) GCI does not include referral payments made by GMAC Real Estate to Strategic-Partner; and (Z) there shall not be deducted from the calculation of GCI Strategic-Partner's expenses, membership or other fees (including multiple listing service fees) or payments made to brokers, sales associates or employees working in association with, or licensed through, Strategic-Partner.

C. **"Real Property"** includes single and multiple unit residential housing, commercial properties, farm houses, vacant or unimproved land to be used for residential, recreation or

commercial purposes, condominiums, cooperatives, townhouses, vacation houses, interests in interval-ownership/ time-share residential units and mobile homes when affixed to the ground.

**10. FEES.**

Strategic-Partner agrees to pay the following fees (in United States dollars) to GMAC Real Estate:

A. **Joining Fee.** Simultaneously with the execution of this Agreement (if this Agreement is not being executed upon the expiration of a similar contract between Strategic-Partner and GMAC Real Estate or its predecessor), a Joining Fee in an amount equal to $20,000 if the Licensed Site is Strategic-Partner's first GMAC Real Estate office within a particular market area, or $7,500 if the Licensed Site is located within the same market area, as determined by GMAC Real Estate, as another GMAC Real Estate office owned by Strategic-Partner. Notwithstanding the foregoing, if Strategic-Partner qualifies for the Classic Market Program (as described hereinafter), the Joining Fee will be $7,500, regardless of the number of GMAC Real Estate offices Strategic-Partner operates. For purposes of this Agreement, the "Classic Market Program" is a reduced-Joining Fee program open to strategic-partners that (i) earned $499,999 or less of GCI in the twelve (12) calendar months immediately preceding the Effective Date and (ii) are not located within any Metropolitan Statistical Area, as determined in accordance with the then-current standards of the United States Office of Management and Budget.

B. **Royalty Fees.** In accordance with the provisions of Exhibit A, attached.

C. **Referral Office Fee.** A Referral Office Fee of $504 per year, billed in monthly installments of $42 per month (or $485 if paid in full, in advance, on the Effective Date and on each subsequent anniversary date thereof). Strategic-Partner acknowledges that payment of the Referral Office Fee is required to help defray the costs of promoting GMAC Real Estate's broker to broker referral network and that payment of the Referral Office Fee does not insure that Strategic-Partner will receive any such broker to broker referrals.

D. **Referral Fee.** A referral fee, in accordance with Section 15 below, to GMAC Real Estate and, as applicable, any of its strategic-partners, within 10 days of the receipt by Strategic-Partner of a commission or fee generated from a transaction which was referred to Strategic-Partner by GMAC Real Estate or any of its strategic-partners.

E. **Advertising Fee.** In accordance with the provisions of Exhibit A, attached. Advertising Fees shall be used in connection with the Advertising Fund, described in Section 14 of this Agreement

F. **Business Conference Registration Fee.** Each attendee each must pay the then-current registration fee.

**11. PAYMENT OF FEES/REPORTING.**

A. Strategic-Partner agrees to pay all fees as set forth above and on the appropriate Exhibit, and to use such forms or computer software as recommended by GMAC Real Estate. Strategic-Partner agrees to furnish reports to GMAC Real Estate as the latter may reasonably

require, including, but not limited to, periodic financial reports and statements, as provided in this Agreement and as may be reasonably requested by GMAC Real Estate in the future. In addition, beginning with the Effective Date and ending at 11:59PM on July 31, 2006 Strategic-Partner agrees to furnish to GMAC Real Estate, on a quarterly basis, copies of Strategic-Partner's financial statements for the preceding quarter, indicating Strategic-Partner's monthly and year to date performance.

B.  GMAC Real Estate shall have the right to set-off any amounts due to Strategic-Partner (including Awards – as defined in Exhibit A, if applicable) against any amounts due from Strategic-Partner to GMAC Real Estate or to any Affiliate of GMAC Real Estate (an "**Affiliate**" of GMAC Real Estate is defined as an entity, the majority ownership of which is held, directly or through subsidiaries, by General Motors Acceptance Corporation).  Within 90 days of receiving a notice, in writing, from GMAC Real Estate to do so, Strategic-Partner shall make all reports through a broker reporting system ("BRS") approved by GMAC Real Estate and beginning with the Effective Date shall make all payments to GMAC Real Estate, including payments due under any outstanding Loans,  electronically, through an electronic funds transfer account/system ("**EFT**") approved by GMAC Real Estate, which may or may not use a BRS, the transfers to be completed on the 20th.  After receipt of such written notice and within the above time period, Strategic-Partner shall install and use a BRS and/or EFT, including all required hardware and software.  Acceptable BRS's and EFT's will be those set forth on a document prepared and distributed by GMAC Real Estate to Strategic-Partner, together with (or prior to) the service of the written notice referenced above. As to each BRS and EFT (as applicable), Strategic-Partner shall (A) continuously maintain a software support system through an agreement with a reputable and competent service provider, (B) promptly cause to be rectified all problems which interfere with the proper operation of the BRS, (C) install updated versions as they become available, and (D) enter promptly (within 48 hours of settlement or closing, as to fees based on GCI or transactions) and accurately all information requested, including information related to listings, pendings, offices and agents.  In addition, as to each EFT: (Y) Strategic-Partner shall enter into and keep effective whatever agreements with third-parties (including Strategic-Partner's financial institution) are required to permit GMAC Real Estate to withdraw electronically from Strategic-Partner's account amounts to which GMAC Real Estate is entitled and to provide in such agreements that 30-days prior notification will be given to GMAC Real Estate before such agreements are terminated, suspended or materially changed, and (Z) Strategic-Partner shall maintain sufficient monies in its accounts to cover all withdrawals permitted to be made by GMAC Real Estate.

C.  Strategic-Partner agrees to furnish to GMAC Real Estate, on an ongoing updated basis and in form as reasonably requested by GMAC Real Estate, a roster of sales agents, brokers and other persons associated with Strategic-Partner who are authorized and/or licensed to conduct real estate sales activities, which roster shall include, as to each such sales agent and broker, the name, address, real estate license number (with a copy of the license), date of association, date of termination, location of office from which each such sales agent and broker is operating and other items that may reasonably be requested by GMAC Real Estate, from time to time.

## 12. LATE PAYMENT.

If Strategic-Partner fails to make payment of any fee within 15 days of its due date: (a) Strategic-Partner shall pay to GMAC Real Estate interest on the payment due at the annual rate of prime plus 4%, but, in any event, not less than 12% nor more than 15%; "**prime**" is defined as the interest rate published in The Wall Street Journal (the "**WSJ**") in its money rate section on the 1st business day of each month, as the prime or base lending rate being offered on that day (if such interest rate is not so published in the WSJ, "prime" shall be the average prime or base lending rate, as of that date, being offered by Citibank, N.A., to its most credit-worthy customers for 90-day loans); (b) GMAC Real Estate shall have the right, at its option, to deduct all such amounts from any payments due to Strategic-Partner pursuant to this Agreement or otherwise; (c) if the delinquent payment is in connection with a deferred payment plan, subject to any contrary provision in any documentation evidencing such a deferred payment plan, all present and future payments shall be automatically accelerated and all amounts due under the plan shall be considered due and payable; and (d) at the option of GMAC Real Estate and after written notice has been served upon Strategic-Partner, GMAC Real Estate may terminate Strategic-Partner's right to receive referrals, change any territorial provisions and/or, if Strategic-Partner's Fee Schedule is based solely on GCI, terminate Strategic-Partner's right to receive Awards (as defined in Exhibit A, if applicable). In the event collection action is necessary to recover monies due to GMAC Real Estate, Strategic-Partner agrees to pay the costs of collection, including agency and attorneys fees and court costs.

## 13. VERIFICATION RIGHTS.

No later than one hundred twenty (120) days following the end of each calendar-year during the Term (including any calendar-year in which the Term expires), Strategic-Partner shall provide to GMAC Real Estate annual financial statements in a form acceptable to GMAC Real Estate. If Strategic-Partner is conducting a business which is not covered by this Agreement, Strategic-Partner shall maintain a separate set of books and records for its real estate brokerage operations. Strategic-Partner shall permit a GMAC Real Estate representative to inspect and audit Strategic-Partner's accounting records and books for each line of business in which Strategic-Partner engages. If it is determined that Strategic-Partner has reported to GMAC Real Estate any fees due under this Agreement which are 3% or more lower than the fees actually due hereunder, Strategic-Partner shall pay to GMAC Real Estate, in addition to the unpaid fees, interest on the unpaid fees as provided in Section 12, plus the actual travel costs and expenses of the auditors and other persons involved in the inspection and/or audit. GMAC Real Estate shall have the right to inspect Strategic-Partner's offices and to confer with Strategic-Partner, its sales associates and employees to assure compliance with the standards GMAC Real Estate prescribes from time to time. GMAC Real Estate also shall have the right, and Strategic-Partner and each of its Owners hereby confirms that each of them so authorizes GMAC Real Estate to complete a credit investigation concerning each or all of them from time to time during the Term, as and in whatever manner GMAC Real Estate deems necessary in its sole discretion.

## 14. ADVERTISING FUND.

A. Within its sole discretion, GMAC Real Estate (or an entity designated by GMAC Real Estate, in which event, such entity shall have all the rights and obligations of GMAC Real

Estate with respect to the Advertising Fund, as provided in this Section) may establish and operate a fund (the "**Advertising Fund**" or the "**Fund**") for the purpose of providing marketing and advertising relative to the Marks. The Advertising Fund shall consist of monies paid to GMAC Real Estate by entities using the Marks, including Strategic-Partner. The monies paid to GMAC Real Estate as Advertising Fees (or otherwise designated by GMAC Real Estate as monies to be used by the Advertising Fund) shall be used by GMAC Real Estate, within its sole discretion, to, among other things: (A) create, produce, administer and support (either in-house or outsourced) national, regional and local marketing, advertising, public relations, promotional and other programs (together, "**Programs**"); and (B) present and promote a national business conference.

B. The amount, type, timing, content, location, cost and all other matters relating to Programs sponsored by the Advertising Fund or to which the Advertising Fund contributes, shall be within the sole discretion of GMAC Real Estate. Monies expended from the Advertising Fund on Programs in areas served by Strategic-Partner are not required to be proportionate to the amount of Advertising Fees paid by Strategic-Partner. Expenditures from the Advertising Fund shall be charged first to earned interest, if any.

C. GMAC Real Estate, in any calendar year, may expend from the Advertising Fund amounts which are greater or lesser than either amounts received by the Advertising Fund in such year or amounts contained in the Advertising Fund during that year (regardless of when they were collected). If a lesser amount is expended, the balance shall be carried over to the next year; if a greater amount is expended, the excess amount shall be repaid to GMAC Real Estate (or to whomever provided such monies, if other than GMAC Real Estate) from fees received by the Advertising Fund in the next year.

D. In the event a strategic-partner is delinquent in the payments required to be made by it to the Advertising Fund, GMAC Real Estate shall have the right (but not the obligation) to undertake collection action against the delinquent strategic-partner and to charge the reasonable costs of collection (including, but not limited to, collection agency fees, attorney's fees and costs) to the Advertising Fund. GMAC Real Estate, within its sole discretion, shall have the right to settle, reduce, compromise or waive payments required to be made by a strategic-partner to the Advertising Fund.

E. Advertising Fees (and all other monies received by the Advertising Fund) shall be accounted for separately, but may be deposited and commingled with any other funds of GMAC Real Estate. On or before April 30 of each year, GMAC Real Estate shall prepare a financial statement of the Advertising Fund for the prior calendar year, which shall be certified by a senior officer of GMAC Real Estate and shall be forwarded to Strategic-Partner, upon Strategic-Partner's written request. Strategic-Partner shall have the right to reasonably review the books and records of the Advertising Fund at GMAC Real Estate's principal place of business, upon reasonable prior notice to GMAC Real Estate.

F. GMAC Real Estate shall have the right, in its sole discretion, to negotiate with any strategic-partner a different arrangement than that set forth in the Section entitled "Advertising Fees", relating to the payment of Advertising Fees, including, but not limited to, payments by such strategic-partner for designated local marketing in lieu of the payment by such strategic-

partner of Advertising Fees, or payments from the Advertising Fund to a strategic-partner for designated local marketing, where national or regional marketing is determined to be inappropriate or where other situations, peculiar to a local market, are determined by GMAC Real Estate, within its sole discretion, to require such action.

G.  GMAC Real Estate, within its sole discretion and upon 30-days notice to Strategic-Partner, may suspend or discontinue (and, thereafter, within its sole discretion, reinstate) the Advertising Fund, provided that, upon a suspension or discontinuance, the Fund shall continue to be operated until all monies in the Fund are expended in accordance with the provisions of this Agreement.

H.  GMAC Real Estate's obligations with respect to the Advertising Fund and the collection, maintenance and distribution of Advertising Fees are as set forth in, and limited to, those contained in the provisions of this Agreement.  In no event shall GMAC Real Estate be deemed to have fiduciary obligations to Strategic-Partner as to the operations of the Advertising Fund.

## 15. REFERRALS.

A.  **Broker to Broker Referrals**.  With respect to a broker-to-broker referral to be made by Strategic-Partner, Strategic-Partner shall make each such referral to an eligible GMAC Real Estate strategic-partner or, if no such strategic-partner is located in the applicable area, then to another broker approved by GMAC Real Estate (hereinafter an "Authorized Alternative Broker").  All such referrals shall be made either by contacting GMAC Real Estate to have GMAC Real Estate facilitate the referral or by directly contacting such strategic-partner.  The strategic-partner who places the referral must register the transaction with GMAC Real Estate.  To register a referral, Strategic-Partner must submit the required referral form to include complete contact information as provided at the time that the referral is accepted by the destination broker.  This referral form is required regardless of whether the destination broker is a strategic-partner of GMAC Real Estate or is an Authorized Alternative Broker.  Strategic-Partner shall pay referral fees and royalties as set forth below.

If another GMAC Real Estate strategic-partner refers a transaction to Strategic-Partner, Strategic-Partner as the destination company will, within 10 days after it receives any GCI from that referred transaction, pay to the originating strategic-partner a fee equal to 25% of the GCI that Strategic-Partner earned from the referred transaction.  Strategic-Partner then will pay Royalty Fees based on the net GCI from the referred transaction.

Likewise, if Strategic-Partner refers an outgoing transaction to another strategic-partner or Authorized Alternative Broker, that other broker will pay to Strategic-Partner a fee equal to 25% of the GCI it earned from the referred transaction.  In that instance, Strategic-Partner as the originating broker then will pay GMAC Real Estate a fee equal to 2.5% of the GCI that the other broker earned from the referred transaction (which may also be stated as 10% of the amount that Strategic-Partner received from the other broker).

B.  In the event Strategic-Partner fails to comply with the above procedures or with the policies, standards or procedures adopted by GMAC Real Estate, from time to time, regarding

referrals, GMAC Real Estate may, at its option (and in addition to any other remedies available to it for a Default of this Agreement), suspend further referrals to Strategic-Partner, remove Strategic-Partner from the authorized referral directory, require referral training attendance, terminate this Agreement or take other action deemed appropriate.

C.  Strategic-Partner acknowledges that it acquires no rights or expectations with respect to referrals, whether from corporate relocation activities or otherwise, beyond those expressly stated in this Section.

## 16. PREMIER SERVICE℠; PERFORMANCE STANDARDS.

A.  Strategic-Partner agrees that retention of market coverage, consistent performance, recruitment and training of a full-time, professional sales staff and commitment to the programs of GMAC Real Estate are necessary for retention of the license granted by this Agreement. Of primary importance is Strategic-Partner's full engagement in the process of Premier Service℠, a systematic and measurable way to conduct business. In addition to satisfying the Premier Service training requirements described in Section 5.C. above, Strategic-Partner agrees to participate in the Premier Service survey process by registering the Licensed Site and requesting every buyer and seller represented by Strategic-Partner to complete a Premier Service survey upon completion of a transaction. Strategic-Partner is responsible to pay a one-time registration fee for the Licensed-Site and a fee for each survey sent to a buyer or seller. In addition, Strategic-Partner shall use Strategic-Partner's best efforts, and shall actively encourage its managers and sales agents, to implement third-party and affiliated programs sponsored by GMAC Real Estate, through its Strategic Alliance Group or otherwise.

B.  Continuation of This Agreement. Strategic-Partner's performance shall be reviewed annually on the anniversary of the Effective Date. Strategic-Partner's average GCI shall exceed, for the 1 year period being reviewed, 75% of the higher of (a) GCI attained during the first year after the Effective Date (or, if the review period is for the first year after the Effective Date, the last year prior to the Effective Date), or (b) GCI attained during the 1-year period prior to the 1-year period being reviewed, or (c) the average of the prior 3 years (if Strategic-Partner has been licensed for such period). Failure by Strategic-Partner to meet this performance standard shall constitute an Event of Default under this Agreement, provided, however that Strategic-Partners' failure to meet this performance standard will not constitute an Event of Default under each of the Sister Agreements (as defined below) so long as the overall performance of Strategic-Partner has met the performance standard. Notwithstanding the provisions of this subparagraph (b), if the Market Area (as later defined) serviced by Strategic-Partner is negatively impacted as a whole, to the extent that the total sales volume, by dollar, of residential property sold during the year being reviewed is less than 90% of the total sales volume, by dollar, of residential property sold during the prior year, the percentage of GCI to be maintained by Strategic-Partner shall be reduced proportionately (e.g., if the total sales volume of the year being reviewed is 90% of the total sales volume of the prior year, the percentage required to be maintained by Strategic-Partner shall be reduced by 10%, i.e., to 67.5% - 10% of 75%). "**Market Area**" shall be the area serviced by those multiple listing services (the "**MLS**") in which Strategic-Partner filed 80% or more of its listings during the prior 12-month period; total sales volume shall be as reflected by the records of the MLS.

C.    Continuation of Licensed Territory. Strategic-Partner's performance shall be reviewed annually on the anniversary of the Effective Date. Strategic-Partner shall be required to achieve a minimum of 10% compounded growth in GCI each year during the Term (after calculating the effect of the Market Collapse provisions, if applicable, as set forth in subsection (b), above).

Failure by Strategic-Partner to meet the performance standards described in this subsection (c) shall result in either the termination of those provisions of this Agreement concerning Strategic-Partner's Licensed Territory or the modification of those provisions (including the reduction in the size of the Licensed Territory), within the discretion of GMAC Real Estate.

## 17. ASSIGNMENT; OWNERSHIP; TRANSFERS; RIGHT OF FIRST REFUSAL.

A.    **Assignment by GMAC Real Estate**. GMAC Real Estate shall have the right, within its sole discretion, to assign or transfer this Agreement and/or any of its rights or obligations under this Agreement to a third-party, whether or not such third-party is affiliated with GMAC Real Estate.

B.    **Transfer of Agreement, Assets by Strategic-Partner**.    Strategic-Partner acknowledges and agrees that GMAC Real Estate has entered into this Agreement in reliance upon the qualifications and representations of Strategic-Partner and, where Strategic-Partner is an entity, upon the qualifications and representations of both Strategic-Partner and Strategic-Partner's Owners (as defined in Section 8). Therefore, Strategic-Partner agrees that it shall not, without the prior written consent of GMAC Real Estate, Transfer (as defined in Section 17.E. below) this Agreement, any interest in its licensed business, or all or substantially all of its assets. GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement. Additionally, any such consent will be conditioned upon the following: (1) the Transfer of this Agreement may occur only in connection with the Transfer of the entire business conducted pursuant to this Agreement; (2) the transferee has agreed, in writing, to honor Strategic-Partner's obligations under this Agreement; (3) all of Strategic-Partner's obligations to GMAC Real Estate (financial and otherwise) have been satisfied; (4) agreement by the transferee (or a principal of the transferee) to attend required training; (5) a copy of all relevant Transfer documentation is delivered to GMAC Real Estate; (6) at least 30-days prior written notice is given to GMAC Real Estate; and (7) the transferee executes a franchise agreement in the form as contained in the most recently filed offering circular, for the term indicated in that form (but not less than 5 years), commencing with the date of execution of the new agreement. Strategic-Partner shall remain liable to GMAC Real Estate pursuant to this Agreement with respect to all obligations which are based on actions or omissions prior to the effective date of the Transfer.

C.    **Ownership**. Strategic-Partner certifies that: (i) Strategic-Partner is an individual or, if one of the entities described below is checked, it is that type of entity; and (ii) if Strategic-Partner is an entity, the Owners listed below are the only principals or persons holding an ownership interest in Strategic-Partner and the percentage of ownership interest held by each is set forth next to the name of each such person (if an ownership interest is held by another entity,

Strategic-Partner certifies that there is set forth below each successive ownership interest, until individual ownership interests are reached and disclosed). Strategic-Partner shall notify GMAC Real Estate, in writing, prior to any change in the ownership interests (or the percentages) shown below or any change in the broker of record (the name of whom is set forth below).

(X)        corporation: organized under the laws of the State or Commonwealth of
           Florida_____

( )        limited liability company: organized under the laws of the State or
           Commonwealth of _____

( )        partnership (indicate type): organized under the laws of the State or
           Commonwealth of _____

Owners:

M. Susan McIntyre_____        92.5%

Jan Walker_____               7.5%


(Ownership interest holders listed)

Tom McIntyre_____
(Broker of Record)

D. **Transfer of Ownership Interests in Strategic-Partner**.  The written consent of GMAC Real Estate shall be required with respect to any Transfer of an ownership interest equal to or greater than 10% of the total ownership interests in Strategic-Partner (including Transfers which, over a period of 2 years, each individually involve less than 10% of the ownership interests, but cumulatively, equal or exceed a Transfer of 10% or more of the ownership interests). GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement.  Strategic-Partner shall provide at least 60 days prior written notice to GMAC Real Estate of any Transfer of the type described in the first sentence of this Section 17.D. (but, in the case of a Transfer upon the death of an Owner, within 30 days after the date of such death). Within 60 days of its receipt of the notification, GMAC Real Estate shall notify Strategic-Partner or transferee of its consent or refusal to consent to the proposed Transfer.  Notwithstanding anything herein to the contrary, GMAC Real Estate's consent shall not be required for the transfer of any Ownership Interests to one or more of the children of any of the Owners named in Section 17.C., provided, however, that the required notice is given and the appropriate documentation is signed.

E. **Definition of a Transfer**.  For purposes of Sections 17.B. and 17.D., the term "Transfer" shall mean any sale, lease, assignment, conveyance or other transfer including: (i) those occurring involuntarily or by operation of law, including those resulting from death, marriage, incompetency or similar events; (ii) those occurring through merger, acquisition, consolidation, dissolution, bankruptcy, execution or foreclosure sale or similar events or those

occurring between/among the spouse and/or children of an Owner; and (iii) those occurring through any other voluntary act.

F. **Effect of Unauthorized Transfer**. In the event of a Transfer for which consent was required pursuant to this Section 17, but such consent was not obtained, both Strategic-Partner and the transferee shall be required to comply with the provisions of this Agreement and shall be obligated to GMAC Real Estate to do so. A failure to comply with the provisions of this Section 17 shall constitute an Event of Default under this Agreement.

G. **Right of First Refusal**. As to any Transfer referenced in 17.B. or 17.D. above (except a Transfer of ownership interests between/among the spouse and/or children of an Owner or between/among Owners and for a Transfer of less than a controlling interest in Strategic-Partner, provided Susan McIntyre remains the majority owner of Strategic-Partner), GMAC Real Estate shall have the right, at its option, to purchase (or otherwise have transferred to it) the stock and/or assets of Strategic-Partner, under substantially the same conditions as a proposed Transfer to a third-party (the "**Right of First Refusal**"). Prior to an Transfer to a third-party, Strategic-Partner shall serve upon GMAC Real Estate a copy of the term sheet, letter of intent or contract (the "**Offer Document**") whereby Strategic-Partner has agreed with a third-party to an Transfer, together with a certification from the transferor(s) that the Offer Document accurately and fully represents all the terms and conditions of the proposed Transfer and a copy of all due diligence materials furnished by Strategic-Partner to the third-party upon which the third-party based its offer as provided in the Offer Document. If, within 10 days of receipt by GMAC Real Estate of the above documentation (the "10-day Notice Period"), GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected to exercise its Right of First Refusal, GMAC Real Estate and Strategic-Partner shall be deemed to have entered into a contract based on the same terms set forth in the Offer Document and, thereafter, each party shall be bound by its terms, provided the Offer Document provides (and, shall be deemed to so provide, if it does not), that: (i) GMAC Real Estate shall have the right to substitute cash for any other form of payment provided in the Offer Document; and (ii) the date of closing or settlement shall be not less than 60 days from the date of service by GMAC Real Estate upon Strategic-Partner of the notice that it has elected to exercise its Right of First Refusal; and (iii) Strategic-Partner makes the customary warranties and representations given by the seller of the assets of, or ownership interests in, an entity operating a real estate brokerage business, including, but not limited to, those related to title, the operating condition of the assets, the validity of contracts and the extent of liabilities. If, within the 10-day Notice Period, GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected not to exercise its Right of First Refusal or if no notice is so served by GMAC Real Estate, GMAC Real Estate shall be deemed to have waived its Right of First Refusal for a period of 180 days from the beginning of the 10-day Notice Period (the "**180-day Waiver Period**"). If, within the 180-day Waiver Period, Strategic-Partner effectuates the Transfer in accordance with the terms and conditions of the Offer Document, the Right of First Refusal shall be considered terminated. If, within the 180-day Waiver Period, the Transfer is not effectuated in accordance with the terms and conditions of the Offer Document or any material term or condition of the Offer Document is changed, the Right of First Refusal shall be considered reinstated and the procedures set forth above shall be followed with respect to any proposed Transfer (including a proposed Transfer which was the subject of a Offer Document that was changed during any 180-day Waiver Period).

## 18. TERMINATION; DEFAULT; CROSS-DEFAULT.

This Agreement may be terminated upon any one of the following conditions (in addition to the conditions specifically mentioned elsewhere in this Agreement and unless otherwise provided by the law of the state in which Strategic-Partner is located). Prior to the effective date of termination, Strategic-Partner shall pay all monies due, or to become due pursuant to this Agreement, to GMAC Real Estate and shall furnish GMAC Real Estate with all required reports and records. After termination, GMAC Real Estate shall have no further obligations to Strategic-Partner.

A. **By Strategic-Partner**. If GMAC Real Estate is in Default (as defined in Section D. below) of this Agreement, Strategic-Partner may terminate this Agreement, effective upon service upon GMAC Real Estate of a written notice of termination (the "**Strategic-Partner's Termination Notice**"), provided, prior to the service of Strategic-Partner's Termination Notice, Strategic-Partner had served upon GMAC Real Estate a written notice of such Default (the "**Strategic-Partner's Default Notice**") which specified the nature and extent of the Default, including identification of the specific provision of this Agreement which GMAC Real Estate is in Default of, and GMAC Real Estate failed to cure such Default within 30 days after receipt of Strategic-Partner's Default Notice or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, GMAC Real Estate failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by GMAC Real Estate within 90 days of the service of the Strategic-Partner's Default Notice, despite the diligent efforts of GMAC Real Estate to do so, Strategic-Partner shall have the right to serve Strategic-Partner's Termination Notice at any time thereafter, until the Default is cured).

The service of Strategic-Partner's Termination Notice by Strategic-Partner shall: (1) be deemed to be an irrevocable waiver by Strategic-Partner of the exclusivity of the Licensed Site and the Licensed Territory and GMAC Real Estate shall be free to license other parties to use the Marks at the Licensed Site and within the Licensed Territory, and (2) relieve other strategic-partners of the Franchise of any obligations regarding the placement of referrals with Strategic-Partner.

B. **By GMAC Real Estate (Automatic)**. Each of the following shall constitute an Event of Default, which, among other things, shall result in an automatic termination of this Agreement (unless GMAC Real Estate, in its sole discretion, notifies Strategic-Partner, in writing to the contrary), effective immediately, without notice to Strategic-Partner:

(1)     Strategic-Partner becomes insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy (or similar proceeding) is filed by Strategic-Partner or is filed against Strategic-Partner and is not opposed by Strategic-Partner; or if a final judgment in an amount of $25,000 or more is entered against Strategic-Partner and is not covered by a policy of insurance remains unsatisfied for a period of 60 days; or, if Strategic-Partner is an individual and except as otherwise provided in this Agreement, Strategic-Partner dies, or, if Strategic-Partner is an entity, Strategic-Partner ceases to exist; or if execution is levied against Strategic-Partner or Strategic-Partner's business, assets, ownership interest or property.

(2)    Strategic-Partner ceases to operate its real estate brokerage business, which shall include failing to keep its offices open and staffed during all regular business hours, properly equipped for the transaction of real estate brokerage activities; provided, however, that if Strategic-Partner's business premises are damaged or destroyed, Strategic-Partner shall have 30 days after such event in which to apply for approval from GMAC Real Estate to relocate or reconstruct the premises, which approval shall not be unreasonably withheld, delayed or conditioned.  Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any cessation of its real estate brokerage business or the closure of any of its offices;

(3)    The real estate brokerage license of Strategic-Partner, of Strategic-Partner's broker of record (or the equivalent) or of any Owner is suspended, revoked or not renewed, or Strategic-Partner's right to do business in the jurisdiction in which any of Strategic-Partner's Licensed Sites is located.  Strategic-Partner shall notify GMAC Real Estate, in writing, immediately upon the occurrence of any of the above events;

(4)    Strategic-Partner or any Owner conducts its real estate brokerage operations in such a fashion as to reflect unfavorably on GMAC Real Estate, its name, goodwill or reputation, or on the Marks, including, but not limited to, the employment of or other association with any individuals who have been convicted of a crime; or Strategic-Partner acts or fails to act in such a manner as to be in violation of any law or regulation.  Without limiting the generality of the foregoing, any breach of the representations or warranties set forth in Section 20.C. hereof shall result in automatic termination of this Agreement.  Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any of the above events;

(5)    Strategic-Partner or any Owner purports to Transfer any rights or obligations under this Agreement or any interest in Strategic-Partner to a third party without GMAC Real Estate's prior written consent, contrary to the provisions of this Agreement;

(6)    Strategic-Partner or any Owner makes any material misrepresentation or omission in its application or Business and Financial History Form or Strategic-Partner maintains false books or records or makes any false reports or statements to GMAC Real Estate; or

(7)    Strategic-Partner or any Owner is in Default of any provision of this Agreement and was served with a GMAC Real Estate Default Notice (as defined below) in the preceding 12-month period.

C.  **By GMAC Real Estate (Right To Cure).**  If Strategic-Partner or any Owner is in Default of this Agreement based on acts or omissions not referenced in Section 18.B., above, GMAC Real Estate, in addition to all other remedies available to it, may terminate this Agreement, effective upon service upon Strategic-Partner of a written notice of termination (the "**GMAC Real Estate Termination Notice**"), provided, prior to the service of the GMAC Real Estate Termination Notice, GMAC Real Estate had served upon Strategic-Partner a written notice of such Default (the "**GMAC Real Estate Default Notice**") which specified the nature

and extent of the Default and Strategic-Partner failed to cure such Default within 30 days after receipt of the GMAC Real Estate Default Notice, or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, Strategic-Partner failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by Strategic-Partner within 90 days of the service of the GMAC Real Estate Default Notice, despite the diligent efforts of Strategic-Partner to do so, GMAC Real Estate shall have the right to serve a GMAC Real Estate Termination Notice at any time thereafter, until the Default is cured).

D. **Default and Event of Default**. The term **"Default"**, as used throughout this Agreement, shall mean a material failure to comply with a provision of this Agreement. The term **"Event of Default"**, as used throughout this Agreement, shall mean a Default for which this Agreement provides no period to cure or for which the period to cure has expired.

E. **Additional Remedies upon an Event of Default.** Should Strategic-Partner commit an Event of Default, GMAC Real Estate, without terminating this Agreement, may, at its option, (and in addition to any other remedies available to it under this Agreement), suspend services to Strategic-Partner, remove Strategic-Partner from any GMAC Real Estate websites and other directories, eliminate Strategic-Partner's exclusive territory (if any) under this Agreement, suspend further referrals to Strategic-Partner and remove Strategic-Partner from the authorized referral directory, or take other action deemed appropriate.

F.                                                      **Cross-Default.**
Notwithstanding any contrary provision of this Agreement or any other Franchise Agreement between Strategic-Partner (and/or its Owners or affiliates) and GMAC Real Estate (each such other Franchise Agreement being a **"Sister Agreement"**), any occurrence of Strategic-Partner's Default and/or Event of Default under this Agreement shall constitute a Default and/or Event of Default under each Sister Agreement, and any occurrence of Strategic-Partner's Default and/or Event of Default under any Sister Agreement shall constitute a Default and/or Event of Default under this Agreement. As of the Effective Date of this Agreement, the agreements covering the following offices shall constitute the Sister Agreements: 813 N. Atlantic Avenue, Cocoa Beach, FL 32931, 147 Lyman, Winter Park, FL, 3171 W. Vine St., Kissimmee, FL, 6084 South Apopka Vineland Rd., Orlando, FL, 1710 E. Highway 50, #115, Clermont, FL, 4250 Alafaya Trail, Suite 164, Oviedo, FL, 4247 Lake Mary Blvd., Lake Mary, FL, 8925 West Colonial Drive, Ocoee, FL and 13524 Summerport Village Parkway, Windermere, FL 34786.

## 19. OBLIGATIONS UPON TERMINATION.

A. Upon termination of this Agreement, for whatever reason, Strategic-Partner shall:

(1)      within 10 days of such termination, discontinue use of all Marks, including the words "GMAC Real Estate", or any derivation of those words, and refrain from holding itself out to the public in a manner that would suggest that it is a licensee or former licensee of GMAC Real Estate. Strategic-Partner agrees that GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of the

Marks. In addition, if Strategic-Partner has used the words "GMAC Real Estate" as part of its internet domain name and such use has not terminated within 10 days of termination of this Agreement, Strategic-Partner will be deemed to have assigned its rights in such domain name to GMAC Real Estate, and GMAC Real Estate may take whatever actions it deems appropriate to terminate such domain name and Strategic-Partner's right to use the same;

(2)    on the date of such termination, pay to GMAC Real Estate all fees, charges and other amounts due to GMAC Real Estate, together with the following additional fees:

(a)    Royalty Fees and Advertising Fees, computed as set forth on Exhibit A, on GCI attributable to transactions in process on the termination date and to transactions under contract on the date of termination that settle or close within 30 days after termination; and

(b)    Referral Fees, computed as set forth above, on referrals sent or received prior to the termination date;

(3)    Surrender to GMAC Real Estate or, at the option of GMAC Real Estate, destroy all signs and documentation bearing the Marks, including yard signs, letterheads, advertising and marketing materials, business cards, manuals, training materials, client promotion materials and the like. GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of materials or programs which are part of the Franchise;

(4)    Take immediate steps to cancel all advertising, including advertising in the Yellow Pages of the telephone directory, which carries the Marks; and

(5)    Execute any documents necessary to effectuate its obligations under this Agreement and take such action as GMAC Real Estate deems reasonably necessary to evidence the fact that Strategic-Partner has ceased using the Marks and has no further right to use the Marks.

B. Upon termination of this Agreement pursuant to Section 18.B. or 18.C. above, in addition to the obligations set forth in Section 19.A. above:

(1)    Strategic-Partner shall:

(a)    pay to GMAC Real Estate all financial losses sustained by GMAC Real Estate as the result of the early termination (if the amount of such losses cannot be calculated exactly, they shall be estimated); and

(b)    remain obligated with respect to the provisions of Section 8 of this Agreement; and

(2)    Owners shall be personally liable to GMAC Real Estate for all financial obligations of Strategic-Partner to GMAC Real Estate, but limited to those obligations

incurred prior to the date of termination and those based on losses attributable to the one-year period after the date of termination.

C. If, after termination of this Agreement, Strategic-Partner fails to comply with its obligations under this Section, in addition to any other payments required to be made by Strategic-Partner to GMAC Real Estate, Strategic-Partner shall reimburse GMAC Real Estate for all its costs related to its attempt to enforce its rights, including the payment of reasonable collection agency's fees, attorney's fees and costs.

## 20. REPRESENTATIONS AND WARRANTIES.

A. Strategic-Partner represents that it is either an individual or an entity (properly formed and authorized to do business in the state in which the Licensed Site is located) licensed to sell real estate in the state in which the Licensed Site is located.

B. Strategic-Partner acknowledges that GMAC Real Estate has delivered to Strategic-Partner, not less than 10 business days prior to the signing of this Agreement, a copy of the Offering Circular concerning this franchise for the state in which the Licensed Site is located and in which Strategic-Partner intends to do business, which Strategic-Partner has had an opportunity to review. Strategic-Partner further acknowledges that GMAC Real Estate has not, either orally or in writing, represented that Strategic-Partner will achieve in the licensed business any specified level of sales or profit, nor represented the sales or profit level of any other licensee, but has referred Strategic-Partner to the Offering Circular which provides Strategic-Partner with the names, addresses and telephone numbers of other licensees of GMAC Real Estate, so that Strategic-Partner can make its own inquiry. Strategic-Partner further acknowledges that any additional inquiry pertaining to the nature of this franchise which Strategic-Partner has made to GMAC Real Estate, in writing, has been answered, in writing, to the satisfaction of Strategic-Partner.

C. Strategic-Partner acknowledges that the President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the "Anti-Terrorism Measures"). GMAC Real Estate therefore requires certain representations and warranties that the parties with whom it deals are not directly or indirectly involved in terrorism. Therefore, Strategic-Partner hereby represents and warrants that neither it nor any of its employees, agents, representatives or, as applicable, its principals, members, officers or directors, nor any other person or entity associated with Strategic-Partner (each, individually, a "Strategic-Partner Party" and collectively, the "Strategic-Partner Parties") is:

(i)　　a person or entity listed in the Annex to the Executive Order; or

(ii)　　a person or entity otherwise determined pursuant to the Executive Order to have committed acts of terrorism or to pose a significant risk of committing acts of terrorism (such a person or entity and those persons and entities listed in the Annex to the Executive Order are referred to herein as "Terrorists"); or

      (iii)    a person or entity who assists, sponsors or who supports Terrorists or acts of terrorism ("Sponsors of Terrorism"); or

      (iv)    owned or controlled by Terrorists or Sponsors of Terrorism.

Furthermore, Strategic-Partner represents and warrants that neither it nor any Strategic-Partner Party will, during the term of this Agreement, become a person or entity described in clauses (i) – (iv) above.

**21. ENTIRE AGREEMENT.**

This Agreement is the entire agreement of the parties and supersedes any and all prior oral or written agreements or understandings between the parties relating to the subject matter of this Agreement.

**22. INDEMNIFICATION AND INSURANCE.**

Strategic-Partner shall defend, indemnify and hold harmless GMAC Real Estate, its shareholder, agents and employees, from and against any claims for damages, losses and expenses (including attorney's fees) resulting in any way from the conduct of Strategic-Partner's real estate brokerage business. This indemnification obligation shall survive the expiration or earlier termination of this Agreement.

In addition to, and not in substitution for, the above indemnification, Strategic-Partner shall, at its own expense, purchase and maintain: (a) comprehensive general liability insurance, including contractual, products/completed operations and personal injury coverage; (b) comprehensive automobile liability coverage, including owned, non-owned and hired automobiles used in Strategic-Partner's real estate brokerage operations; (c) errors and omissions insurance, with respect to Strategic-Partner's real estate brokerage operations. For the insurance referenced under clauses (a) and (b) above, the minimum limits required shall be $1,000,000 per occurrence for bodily injury and $500,000 per occurrence for property damage, with a maximum deduction of $5,000; for the insurance referenced in clause (c) above, the minimum limits shall be $1,000,000 per annum, with a maximum deduction of $5,000. GMAC Real Estate shall be named as an additional insured on each such policy. Workers Compensation insurance, to the extent required by the law of the state in which the Licensed Site is located, shall be purchased and maintained by Strategic-Partner on each employee and sales associate. All losses resulting from Strategic-Partner's failure to obtain insurance shall be borne by Strategic-Partner, only. In the event of cancellation, non-renewal or material change in Strategic-Partner's required insurance policies, Strategic-Partner shall serve upon GMAC Real Estate a notice of such action at least 30 days prior to the effective date of such action. Strategic-Partner shall deliver to GMAC Real Estate a copy of its insurance binder before the Effective Date and, thereafter, shall serve upon GMAC Real Estate continuous certificates of such coverages (which certificates shall provide that the applicable policies shall not be cancelled without serving upon GMAC Real Estate at least 30-days prior notification of such intended cancellation).

## 23. CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS.

A. **Choice of Law.** Except as expressly provided otherwise, this Agreement shall be construed in accordance with the laws of the state in which the Licensed Site is located. However, no law regulating the offer or sale of franchises, business opportunities or similar interests or governing the relationship between GMAC Real Estate and Strategic-Partner will apply unless its jurisdictional requirements are met independently without reference to this Section. All disputes regarding the validity of the arbitration agreement set forth in Section 23.B shall be governed by the laws of the State of Illinois, without regard for its conflict of laws principles.

B. **Arbitration.** GMAC Real Estate and Strategic-Partner agree that, except for controversies, disputes or claims (together or separately, "**Claims**") related to the improper use of the Marks, all Claims between GMAC Real Estate and its affiliates (and their respective shareholders, officers, directors, agents, and/or employees)(together, the "**GMAC Real Estate Parties**"), and Strategic-Partner (and/or Strategic-Partner's Owners, guarantors, affiliates, and/or employees)(together, the "**Strategic-Partner Parties**") arising out of or related to:

      (1)     this Agreement or any other agreement between Strategic-Partner and GMAC Real Estate;

      (2)     GMAC Real Estate's relationship with Strategic-Partner; or

      (3)     any policy or standard relating to the Franchise or the franchised business;

must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association ("**AAA**"). The arbitration proceedings will be conducted by one arbitrator and, except as this section otherwise provides, according to the then current commercial arbitration rules of the American Arbitration Association. All proceedings will be conducted at a suitable location chosen by the arbitrator in the Chicago Metropolitan Area of the State of Illinois and will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

The arbitrator may not declare any Mark generic or otherwise invalid or, except as expressly provided by federal statute, award any punitive or exemplary damages against either party (GMAC Real Estate and Strategic-Partner waive, to the fullest extent permitted by law, except as expressly provided by federal statute, any right to, or claim for, punitive or exemplary damages against the other). The arbitrator shall be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. Each party shall be required to submit all Claims against the other or those Claims shall be forever waived. The arbitrator may not consider any settlement discussions that might have been made by either Strategic-Partner or GMAC Real Estate.

GMAC Real Estate and Strategic-Partner agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between any of the GMAC Real Estate Parties and any of the Strategic-Partner Parties may not be consolidated with any

other arbitration proceeding between GMAC Real Estate and any other person or between Strategic-Partner and any other person.

Despite GMAC Real Estate's and Strategic-Partner's agreement to arbitrate, GMAC Real Estate and Strategic-Partner each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that GMAC Real Estate and Strategic-Partner must contemporaneously submit the dispute for arbitration on the merits as provided in this Section.

The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

C. **Waiver of Jury Trial.** To the extent permitted by law, Strategic-Partner and GMAC Real Estate each waives its right to a trial by jury in any litigation or arbitration proceeding arising from this Agreement or from actions taken pursuant to this Agreement or from the relationship between the parties resulting from this Agreement.

D. **Time Limitations for Claims.** Any claim by Strategic-Partner against GMAC Real Estate shall be barred unless, within one year from the date that Strategic-Partner knew, or should have known, of the facts upon which the claim is based, Strategic-Partner filed a formal request for arbitration against GMAC Real Estate, as set forth above.

## 24. MODIFICATION OF AGREEMENT.

Subject to GMAC Real Estate's right to modify its standards and specifications for use of the Marks and other aspects of the operation of a GMAC Real Estate business, no changes may be made in this Agreement unless in writing and signed by all parties.

## 25. SEVERABILITY.

Each Section and provision of this Agreement is severable and, if one portion is invalid, the remaining portions shall nevertheless remain in full force and effect.

## 26. NON-WAIVER.

No failure by GMAC Real Estate to take action on any Default or Event of Default of Strategic-Partner, whether it is a single instance or a series of instances, shall constitute a waiver of such Default or Event of Default or of the performance required of Strategic-Partner. No express waiver by GMAC Real Estate of any performance or Default or Event of Default of Strategic-Partner shall be construed as a waiver of any other or any future obligation or Default or Event of Default.

## 27. NOTICES; FACSIMILE AND ELECTRONIC MAIL.

A. Any notice provided for in this Agreement shall be in writing, addressed to GMAC Real Estate or Strategic-Partner at the respective addresses set forth at the beginning of this Agreement, and shall be served: (a) by personal delivery (which shall be effective upon such

personal delivery) or (b) by certified mail, return receipt requested, properly addressed, postage prepaid (which shall be effective on the earlier of the date of delivery as indicated on the return receipt card or 3 days after deposit into the United States mails, or (c) by a nationally recognized overnight delivery service, properly addressed, delivery charges prepaid (which shall be effective on the earlier of the date of delivery as indicated on the carrier's receipt records or 2 days after delivery to the carrier).

     B.  Although not effective for purposes of giving notice pursuant to Section 27.A. above, each party consents to the other party forwarding facsimile and electronic mail transmissions to the consenting party as follows:

     GMAC Real Estate:

     To: <u>Contract Administration</u> @ <u>908-542-5526</u> (fax) and <u>susan_daniel@gmachs.com</u> (e-mail)

     Strategic Partner:

     To: <u>Tom McIntyre</u> @ _____(fax) and_____(e-mail)

     Such consent will continue in effect until modified or terminated by written notice to the other party sent in accordance with subparagraph 27.a. above.

## 28. TERM AND RENEWAL.

     The term of this Agreement shall be ten (10) years from the Effective Date (as later defined) (the "Term").

     At the expiration of the Term, Strategic-Partner shall have the right to enter into a new, ten-year agreement with GMAC Real Estate, subject to the following conditions: (a) Strategic-Partner has provided GMAC Real Estate with written notice of its intent to execute a new agreement by the date (the "New Agreement Notice Date") which is at least 180 days prior to the expiration of the Term, (if Strategic-Partner fails to deliver said written notice by the New Agreement Notice Date, GMAC Real Estate may, at any time following the New Agreement Notice Date, eliminate the Licensed Territory be delivering written notice of such action to Strategic-Partner), and (b) Strategic-Partner is not then and has not been in Default of this Agreement. The new agreement will be in the form then being offered by GMAC Real Estate. The new agreement may contain materially different terms than this Agreement, including those which relate to fees, payment of fees, performance standards, renewal terms and the Marks.

     Subject to any contrary applicable state law, if Strategic-Partner continues to use the Marks after the end of the Term, but fails to execute a new agreement, Strategic-Partner will be deemed to be operating under the terms and conditions of the agreement then being offered by GMAC Real Estate, except that the term shall be deemed to be 180 days from the date that GMAC Real Estate is served with a notice of termination by Strategic-Partner (at its option, GMAC Real Estate shall have the right to shorten the term by the service upon Strategic-Partner of a notice fixing a shorter term) and, at the option of GMAC Real Estate but without notice being required, the Royalty Fees shall be increased to an amount equal to 10% of Strategic-

Partner's monthly GCI, payable within 48 hours of the completion of each settlement and closing from which Strategic-Partner is entitled to be paid a commission.

## 29. EFFECTIVE DATE.

The parties intend that this Agreement be effective as of March 1, 2005(the "**Effective Date**").

## 30. FRANCHISE DEVELOPMENT COSTS LOAN.

(1) In recognition of expenses that will be incurred by Strategic-Partner relative to its entering into this Agreement and in order to encourage Strategic-Partner to actively pursue the expansion of its influence in its market area, GMAC Real Estate will loan to Strategic-Partner the sum of up to $200,000 (the "**New Funds**"). In addition, Strategic-Partner acknowledges that it is responsible for two outstanding loans made by GMAC Real Estate to Strategic-Partner (or Strategic-Partner's affiliate, Premier First Holding, LLC ("Premier")), which are evidenced by a (i) Conversion Costs Note, dated February 1, 2001, in the face amount of $40,059.99 with an outstanding balance as of the Effective Date of $7,903.43, **(ii)** a Conversion Costs Note given to GMAC Real Estate by Premier (whose obligations under said note have been assumed by Strategic-Partner simultaneously herewith), dated March 1, 2004, in the face amount of $50,000 with an outstanding balance as of the Effective Date of $40,833.37 (collectively the "**Existing Notes**") and (iii) by certain other loan documentation executed simultaneously with the Existing Notes. The total outstanding unamortized balance under the Existing Notes ($48,736.80) is being consolidated with the New Funds for a total of $248,736.80 (the "**Franchise Development Costs Loan**"), subject to the following:

(a)    on or before the execution of this Agreement by all parties, Strategic-Partner will execute a note (the "**Franchise Development Costs Note**", the form of which is attached as Exhibit B) in the amount of the Franchise Development Costs Loan, subject to the provisions of a Loan & Security Agreement (the "Loan Agreement"), in the form attached as Exhibit C.

(b)    funding of the New Funds will occur following the later to occur of (i) Strategic-Partner's execution of this Agreement, the Franchise Development Costs Note, the Loan Agreement and such other collateral loan documents as GMAC Real Estate may require or (ii) the Effective Date.

(2) In addition, there is an outstanding term loan ("Term Loan") made by GMAC Real Estate to Strategic-Partner, which is evidenced by a Term Loan Note, dated April 18, 2000, in the face amount of $400,000 (collectively the "Term Note", a copy of which is attached as Exhibit D), and by certain other loan documentation executed simultaneously therewith (the "Term Loan Documents"). The Term Note and Loan Documents modified, and as modified, affirmed and reaffirmed, as follows:

all references in the Term Note and Loan Documents to the "Franchise Agreement" are deemed to refer to this Agreement..

**31. LIMITATION OF DAMAGES/RELEASE.**

Except for Strategic-Partner's obligation to indemnify GMAC Real Estate, as provided by common law or in the Section of this Agreement entitled "Indemnification and Insurance", neither party shall be liable to the other for consequential, punitive or exemplary damages.

Strategic-Partner was a party to one or more prior franchise agreements with GMAC Real Estate, GMAC Home Services, Inc. and/or Meredith Corporation (together, the "Prior Franchisors"), including, without limitation, the Real Estate Service Contract dated November 18, 2998 between Strategic-Partner and GMAC Home Services, Inc., as amended from time to time (the "Service Contract"). Strategic-Partner releases and discharges the Prior Franchisors from all claims in any way related to or arising from any prior franchise agreement, including, without limitation, the Service Contract.

**32. CONFIDENTIALITY OF AGREEMENT.**

Except as may be required by law, Strategic-Partner agrees not to publicize or disclose to any third party, without the prior written consent of GMAC Real Estate, the terms of this Agreement.

**[The remainder of this page has been intentionally left blank.]**

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

27

**IN WITNESS WHEREOF**, the parties have executed this Agreement.

GMAC REAL ESTATE, LLC

By: _Judith O'Brien_ (signature)

Print Name: Judith O'Brien

Title: Vice President

Date: _____

SIGNATURE REALTY & DEVELOPMENT, INC.

By: _M. Susan McIntyre_ (signature)

Print Name: M. Susan McIntyre

Title: President

Date: _3-18-05_

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

28

## ENDORSEMENT OF PRINCIPALS / OWNERSHIP INTEREST HOLDERS

Each of the Owners identified in Section 17.B. is executing this Agreement for the limited purpose of being personally bound by the provisions of Sections 3 (The Marks), 4 (Materials), 7 (Certain Activities Not Precluded; Rights Reserved; Provision of Other Settlement Services), 8 (No Conflicting License/Interest), 13 (Verification Rights), 17 (Assignment; Ownership; Transfers; Right of First Refusal), 18.F. (Cross-Default), 19.B. (Financial Obligations after Default) of this Agreement and 23 (Choice of Law and Forum; Arbitration; Waiver of Jury Trial; Time Limitation for Claims).

_M. Susan Mc Intyre_                    Date:  _3-18-05_
M. Susan McIntyre

<u>Exhibit A to the Franchise Agreement</u>
<u>Royalty and Advertising Fees (Percentage of GCI, with Award)</u>

**a.**    **Royalty Fees.**

Strategic-Partner shall pay to GMAC Real Estate, Royalty Fees, in accordance with the following:

**(1)**    <u>Amount</u>.  Upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid Gross Commission Income ("GCI"), a Royalty Fee, in an amount equal to a percentage of the GCI to which Strategic-Partner is entitled, based on the following schedule:

1.85%  beginning March 1, 2005
1.90%  beginning March 1, 2008
2.00%  beginning March 1, 2010
2.10%  beginning March 1, 2012
2.20%  beginning March 1, 2014 through the remainder of the Term of this Agreement.

**(2)**    Monthly <u>Minimums</u>.  In addition, if at the end of each monthly period following the Effective Date, the total amount of Royalty Fees paid by Strategic-Partner under this Agreement and each Sister Agreement (as defined above), during each such monthly period is less than the applicable amount indicated in the chart below (the "**Monthly Fee Minimum**"), Strategic-Partner shall pay to GMAC Real Estate an amount equal to the difference between the Monthly Fee Minimum and the total amount of Royalty Fees actually paid.

| Each Month Occurring... | Monthly Fee Minimum |
|---|---|
| March 1, 2005 through May 31, 2005 | $13,875 |
| June 1, 2005 through February 29, 2008 | $15,417 |
| March 1, 2008 through February 28, 2010 | $15,833 |
| March 1, 2010 through February 29, 2012 | $16,667 |
| March 1, 2012 through February 28, 2014 | $17,500 |
| March 1, 2014 through remainder of Term | $18,333 |

**(3)**    Annual <u>Minimum</u>.  In addition, if at the end of the 12-month period ending February 28, 2006, the total amount of Royalty Fees paid by Strategic-Partner under this Agreement and each Sister Agreement (as defined above), during such 12-month period is less than $185,000 (the "First Year Fee Minimum"), Strategic-Partner shall pay to GMAC Real Estate an amount equal to the difference between the First Year Fee Minimum and the total amount of Royalty Fees actually paid.

**b.**    **Advertising Fees.**

Upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid GCI, Strategic-Partner shall pay to GMAC Real Estate an Advertising Fee, in an amount equal to 2.0% of the GCI to which Strategic-Partner is entitled, provided, however, the amount of the Advertising Fee in any calendar-month: (i) shall not exceed $870 per office for that calendar-month; and (ii) shall not be lower than $240 per office for that calendar-month regardless of transaction count (if this minimum amount has not been received by GMAC Real Estate during any month through payments based on a percentage of GCI for that calendar-month, the difference between this minimum amount and the payments actually received by

GMAC Real Estate shall be paid by Strategic-Partner on the first business day after the last day of each calendar-month).

GCI generated by a sales agent shall be attributed to the office location (and/or Licensed Site) at which the sales agent's license is held or registered or, if the applicable state's licensing regulations do not provide for the holding or registration of sales agents' licenses at particular office locations, at the office location (and/or Licensed Site) from which the sales agent principally operates.

Minimum and maximum Advertising Fees may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the Advertising Fees in any year be greater than 5%). The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

**Exhibit B**
**Franchise Development Costs Note**

## Franchise Development Costs Note

**$248,736.80**                                          **March 1, 2005**

For Value Received, Signature Realty & Development, Inc. ("**Strategic-Partner**"), a Florida corporation, promises to pay to the order of GMAC Real Estate, LLC or its designee (together or singularly, "**GMAC Real Estate**"), at its office at 2021 Spring Road, Suite 300, Oak Brook, IL 60523, or at such other place as the holder of this Note may from time to time direct, the principal sum of two hundred forty-eight thousand seven hundred thirty-six and 80/100 dollars ($248,736.80) (the "**Principal Loan Amount**"), together with interest thereon, as follows:

principal and interest payments (the interest payments being at the Interest Rate, as defined below), each being in an amount equal to:  (a) 1/120[th] of the Principal Loan Amount, as to principal, and (b) all accumulated interest, on the 1st day of the month following the date of this Note and on the 1st day of each month thereafter, for a total of 120 months, with all outstanding principal and interest being payable, in full, on the 1st day of the 120th month following the date of this Note.

**Interest Rate.**  The Interest Rate, as to each monthly interest payment, shall be the interest rate published in the Wall Street Journal (the "WSJ") on the 1st business day of each such month, as the prime or base lending rate (if such interest rate is not so published in the WSJ, the Interest Rate shall be the average prime or base lending rate, as of that date, being offered by the three largest United States banks), plus 2%.

**Principal Reductions.**  Notwithstanding any other provision of this Note, so long as Strategic-Partner has not committed an Event of Default under the franchise agreement (the "**Franchise Agreement**") entered into between the Strategic-Partner and GMAC Real Estate (including all Amendments) and so long as an Event of Default (as defined below) under this Note has not occurred, Strategic-Partner shall not be required to pay to GMAC Real Estate the monthly amounts of principal and interest set forth above and the principal due on this Note shall be deemed reduced by an amount equal to each such monthly principal payment which is not required to be made.

**Use of Funds.**  Lender has imposed no requirements as to use of the Loan proceeds.

**Events of Default.**  An event of default (an "**Event of Default**") under this Note shall include, but not be limited to: a default by the Strategic-Partner under the Franchise Agreement; a termination of the Franchise Agreement, other than as a result of a default by GMAC Real Estate; a default by Strategic-Partner in the payment of any amount due under this Note or any other document between the Strategic-Partner and GMAC Real Estate or between the Strategic-Partner and any Affiliate (as defined in the Franchise Agreement); the entry of a judgment against the Strategic-Partner in excess of $25,000, which is not discharged within 30 days or is not fully covered by insurance; the institution of bankruptcy or similar proceedings by or against

the Strategic-Partner, which are not dismissed within 45 days. Upon the occurrence of an Event of Default, all amounts unpaid under this Note shall immediately become due and payable.

**Strategic-Partner's Waiver.** The Strategic-Partner waives presentment, demand and protest and notice of presentment, protest, default, non-payment or maturity.

**Choice of Law.** This Note and the rights and duties of the parties hereunder shall be governed by, and construed in accordance with, the internal laws of the State of Illinois, without regard to principles of conflicts of laws which would require the application of the laws of a different jurisdiction.

**Arbitration.** Strategic-Partner expressly agrees that all controversies, disputes and claims between GMAC Real Estate and its affiliates (and their respective shareholders, officers, directors, agents, and/or employees) and Strategic-Partner (and/or Strategic-Partner's Owners, guarantors, affiliates, and/or employees) arising out of or related to this Note, or with respect to actions taken pursuant to this Note, must be submitted for binding arbitration in accordance with and subject to the terms of the Arbitration section of the Franchise Agreement, and all such terms are incorporated by reference as if fully set forth herein, provided that all references to the "Agreement" therein shall be deemed to refer this Note as the context so requires.

**Waiver of Jury Trial.** To the extent permitted by law, Strategic-Partner waives its right to a trial by jury in any legal proceeding arising from this Note or from actions taken pursuant to this Note.

Signature Realty & Development, Inc.

By: *M. Susan McIntyre*

Name: M. Susan McIntyre

Title: President

Date: 3·18·05

**Exhibit C**

**Licensed Territory**

Strategic-Partner's Name: Signature Realty & Development, Inc.

**Description of Licensed Territory:**

The Licensed Territory is comprised of a one-mile radius surrounding the Licensed Site located at 4700 Millenia Blvd., Suite 310, Orlando, FL.

**Exhibit D**
**Loan & Security Agreement**

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

A-5

LOAN AND SECURITY AGREEMENT

DATED AS OF MARCH 1, 2005

BETWEEN

SIGNATURE REALTY & DEVELOPMENT, INC.

AND

GMAC REAL ESTATE, LLC AND/OR ITS AFFILIATE

## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement (this **"Agreement"**), dated as of March 1, 2005, between Signature Realty & Development, Inc. (the **"Company"**), doing business as Signature, a Florida corporation and GMAC Real Estate, LLC and/or one of its Affiliates (the **"Lender"**). Capitalized terms used in this Agreement shall have the meanings ascribed to such terms in Section 8 of this Agreement.

### WITNESSETH THAT:

**WHEREAS**, concurrently with the execution of this Agreement, the Company has borrowed from the Lender certain funds for the development of the Company, as evidenced by that certain Franchise Development Costs Note and/or Term Loan Note(individually and collectively, the **"Note"**), in the form attached to this Agreement as Exhibit A; and

**WHEREAS**, the Company and the Lender are entering into this Agreement to set forth, in part, the terms and conditions applicable to the Note and the covenants, agreements, representations and warranties of the Company made in connection with the Note.

**NOW, THEREFORE**, for good and valuable consideration, the parties agree as follows:

SECTION 1.   THE LOAN(S).

*Section 1.1.*    The Lender shall provide to the Company a franchise development costs loan (the **"Development Loan"**) in an amount up to $248,736.80 (with repayment provisions and the rate of interest being as provided in the Note) (the Development Loan is sometimes hereinafter referred to as the "Loan"), as follows:

(a)    $200,000 will be funded as of the date of the execution of the Note (the **"Effective Date"**) conditioned upon:

(i)    Receipt, review and acceptance by Lender of Company's most recent interim financial statement; and

(ii)    Each of Company and Company's affiliate, Premier First Holding, LLC, being current in all reports and payments due Lender under all agreements with Lender; and

*Section 1.2.*    *Interest Rate.* The Interest Rate shall be as provided in the Note.

*Section 1.3.*    *Use of Loan Funds.* Lender imposes no requirements as to use of Development Loan funds. Any requirements relating to the use of Term Loan funds are as set forth in Section 1.1.

## SECTION 2.  REPAYMENT OF THE LOAN AMOUNTS.

Section 2.1.    *Payments.*  Payments will be as provided in the Note.

Section 2.2.    *Voluntary Prepayments.*  The Company shall have the privilege of prepaying the Note, in whole or in part, but, if in part, then in an amount of not less than $10,000.  Each prepayment shall be applied, first, to any accrued interest and, thereafter, to Principal.  All such prepayments shall be applied to installments in the inverse order of their maturity.

Section 2.3.    *Place and Application of Payments.*  All payments shall be made to the Lender as designated by the Lender, in writing.

## SECTION 3.  SECURITY.

Section 3.1.    *Grant of Security Interest.*  As security for the payment of all amounts owing to the Lender and as security for the satisfaction of all other obligations of the Company to the Lender, the Company grants to the Lender a security interest in the following property of the Company, including property presently owned or later acquired (together, the "**Collateral**"): Accounts Receivable, Equipment and Fixtures, Inventory, General Intangibles, Contract Rights and documents of title, Investment Property, all instruments evidencing any obligations to the Company by third parties, all property of the Company with the Lender (excluding property of the Company held by the Lender in escrow for third-parties), all other property of the Company (including, but not limited to, real estate owned or leased by or to the Company), all replacements, substitutions, additions, accessions, products or proceeds to or for any of the foregoing;

Section 3.2.    *Accounts Receivable.*

(a)    Without the prior written consent of the Lender, after the occurrence of a Default or Event of Default, no credit allowance shall be granted by the Company to any account debtor.

(b)    The Company warrants that all of the Accounts Receivable are bona fide existing obligations and all documents furnished to the Lender are genuine.

(c)    The Lender is authorized at any time after the occurrence and during the continuance of an Event of Default:

(i)    To request confirmation of the amount shown by the Accounts Receivable or other Collateral;

(ii)    To endorse in the Company's name and to collect any items of payment received by the Lender in payment of any Account Receivable or other obligation owing to the Company;

   (iii) To notify any entity of the fact of the Lender's lien and of the collateral assignment to the Lender;

   (iv) To direct any entity obligated under any Collateral to make payment directly to the Lender of any amounts due or to become due; and

   (v) To deal with any Collateral in a commercially reasonable manner.

The Lender shall not be under any duty to act in regard to any of the foregoing matters. The costs, including reasonable attorneys' fees, shall be borne solely by the Company.

 *Section 3.3. Inventory.*

   (a) The Company warrants that: (i) all of the Inventory is, and at all times shall be, owned by the Company free of all liens; and (ii) the Company will not make any further assignment of, or permit to exist any further lien on, the Inventory.

   (b) The Lender shall not be liable for the safekeeping of any Inventory delivered to it, unless a loss of Inventory results from the Lender's gross negligence or willful misconduct.

 *Section 3.4. Equipment.*

   (a) The Company shall keep the Equipment in adequate operating condition, ordinary wear and tear excepted, and the Company shall not transfer any Equipment; provided, however, that, without the Lender's consent (but with notice to the Lender), the Company may dispose of Equipment in the ordinary course of business provided (i) the Equipment disposed of in any fiscal year has an aggregate market value of Ten Thousand Dollars ($10,000) or less and (ii) the Company receives fair market value in return.

   (b) The Company will, upon request of the Lender, submit to the Lender a current listing of all of the Company's Equipment.

 *Section 3.5. Supplemental Documentation.* At the Lender's request, the Company shall deliver to the Lender such documentation ("**Supplemental Documentation**") reasonably requested by the Lender to perfect the Lender's security interest in the Collateral.

 *Section 3.6. Collateral for the Benefit of the Lender.* All security interests granted to the Lender and all Collateral shall be deemed to have been granted to the Lender to secure the obligations of the Company to the Lender under this Agreement and the Note.

SECTION 4.   REPRESENTATIONS AND WARRANTIES.

The Company represents and warrants to the Lender as follows:

*Section 4.1.    Authorization; Enforceability; etc.*  The Company is a corporation, duly organized, validly existing and in good standing under the laws of the State or Commonwealth of Florida and is duly licensed or qualified and in good standing in all jurisdictions in which the nature of its activities or the property owned or leased by it requires such qualification or licensing.  The Company is in compliance with the terms of this Agreement and has the authority to enter into this Agreement and to execute the Note and the Collateral Documents, which actions will not violate any provision of law or of the articles or certificate of incorporation or organization or by-laws of the Company or any agreement affecting the Company or any of its property.

*Section 4.2.    Subsidiaries.*  The Company has no Subsidiaries.

*Section 4.3.    Accuracy of Information.*    All financial statements for the Company previously submitted to the Lender are correct, have been prepared in accordance with generally accepted accounting principles, consistently applied, and accurately reflect the financial condition of the Company and the results of the operations and cash flows for the Company as of the dates of such financial statements and for the periods covered by such financial statements.  The Company has no contingent liabilities which are material to it, other than as indicated on such financial statements, and, since the date of the latest of such financial statements, there have been no material adverse changes in the financial condition or in the assets or liabilities of the Company, nor any other changes, except those occurring in the ordinary course of business.

*Section 4.4.    Litigation; Taxes.*    There is no litigation or governmental proceeding pending, nor threatened (to the best knowledge of the Company), against the Company which, if adversely determined, would result in any material adverse change in the financial condition or the properties, business or operations of the Company. Schedule 4.4 contains a list of all pending litigation and known claims.  All tax returns required to be filed by the Company have, in fact, been filed, and all taxes and other charges upon the Company or upon any of its property, income or franchises have been paid.

*Section 4.5.    ERISA.*  The Company is in compliance in all material respects with the Employee Retirement Income Security Act of 1974 and all of its amendments ("ERISA").

*Section 4.6.    Title to Property.*  The Company has good title to all of the property encumbered by this Agreement and by the Collateral Documents.  The Lender has a first priority perfected security interest in all of the Collateral.

*Section 4.7.    Compliance With Laws.*  The Company is in compliance in all material respects with all applicable local, state and federal statutes and regulations.

Section 4.8.    *Business and Collateral Locations.*

(a)    The offices where the Company keeps its books and records are located at the addresses so designated on Schedule 4.8.

(b)    Schedule 4.8 contains an accurate list of the locations of all of the Company's Inventory, Equipment and Fixtures.

Section 4.9.    *Real Property.*    Schedule 4.9 contains an accurate list of the address and legal descriptions of any real property owned by the Company or third parties, on which Fixtures are located.

Section 4.10.    *Patents, Trademarks, etc.*    The Company possesses adequate licenses, patents, etc. (which are listed on Schedule 4.10), to continue to conduct its business as previously conducted by it.

## SECTION 5. COVENANTS.

The Company covenants and agrees with the Lender as follows:

Section 5.1.    *Maintenance of Business.*    The Company shall keep in force and effect all licenses and permits necessary to the proper conduct of its business.

Section 5.2.    *Maintenance.*    The Company shall keep its properties and equipment in good working order.

Section 5.3.    *Taxes.*    The Company shall duly pay all taxes and similar charges against the Company or any of its property before the same become delinquent.

Section 5.4.    *Insurance.*    The Company shall keep insured all insurable property owned by the Company against loss or damage from fire and such other hazards or risks as are customarily insured against by companies similarly situated and the Company shall similarly insure employers' and public liability risks.    The Company shall furnish to Lender a current certificate of such insurance, naming the Lender as an additional insured.

Section 5.5.    *Financial Reports and other Information.*    The Company shall maintain a method of accounting consistent with generally accepted accounting principles and shall furnish to the Lender such information respecting the business affairs, operations and financial condition of the Company as may be reasonably requested; and without any request shall furnish to the Lender:

(a)    within 30 days after the last day of each calendar month, an income statement of the Company for the month and the fiscal year-to-date period then ended and a balance sheet of the Company as of such date, in each case prepared by the Company in reasonable detail showing in comparative form (i) the figures for the corresponding date and period in the previous fiscal year and

(ii) the budgeted results for such period and certified to by the President or chief financial officer of the Company;

(b)    within 60 days after the end of each fiscal year, a copy of the balance sheet as of the end of that fiscal year and the statement of stockholders' or ownership interest holders' equity, income statement and statement of cash flows of the Company for the 12-month period then ended for the Company, all as prepared in accordance with generally accepted accounting principles, consistently applied;

(c)    promptly, after knowledge shall have come to the attention of any officer of the Company, written notice of any threatened or pending litigation or governmental proceeding against the Company which would have a material adverse effect on the business or properties of the Company and/or would trigger the occurrence of any Default or Event of Default;

(d)    promptly, of any change in any of the information set forth on the Schedules attached to this Agreement.

The Lender shall, at all reasonable times, have full access to the Company's books, records, files and audits.

Section 5.6.    *Liens*.    The Company shall not permit to be encumbered any property owned by the Company; provided, however, that the foregoing shall not operate to prevent the liens and security interests created by the Collateral Documents and other liens and security interests granted in favor of the Lender.

Section 5.7.    *Additional Borrowings and Guaranties*.    The Company shall not incur any indebtedness for borrowed money or become liable (including a contingent liability) for any obligation of any other entity; provided, however, that this restriction shall not operate to prevent indebtedness of the Company on the Note and other indebtedness of the Company owing to the Lender.

Section 5.8.    *Acquisitions, Investments and Advances*.    The Company shall not make any investments or loans to any other entity or supply funds to any other entity or acquire any substantial part of the assets or business of any other entity, without the written consent of the Lender (which consent shall be within the sole discretion of the Lender).

Section 5.9.    *Dividends and Certain Other Restricted Payments*.    The Company shall not pay any dividends on its ownership interests, except that, with prior notice to the Lender, if the Company is an "S" corporation or general partnership for income tax purposes, it may declare dividends to shareholders/ownership interest holders in amounts equal to the tax liability of each such shareholder or ownership interest holder resulting from the Company's income, which dividends shall be paid not sooner than 15 days prior to the date on which tax payments for such income are required to be paid by each such shareholder or ownership interest holders.

*Section 5.10. Formation of Subsidiaries.* The Company shall not form or acquire or permit to exist any Subsidiary.

*Section 5.11. Mergers, Consolidations and Sales.* The Company shall not transfer a substantial part of its property and shall not consolidate or be a party to a merger with any other entity. The term "substantial" shall mean the transfer in any fiscal year of five percent (5%) or more of such property.

*Section 5.12. ERISA.* The Company shall promptly pay all obligations arising under ERISA.

*Section 5.13. Contracts With Affiliates.* The Company shall not enter into, with an entity or person affiliated with it, any contract, agreement or business arrangement.

*Section 5.14. Franchise Agreement.* The Company shall take all actions necessary to keep the franchise agreement and any amendment to the franchise agreement (together, the **"Franchise Agreement"**), between Company and GMAC Real Estate LLC, in full force and effect and shall promptly fulfill all of its obligations.

*Section 5.15. Issuance of Capital Stock.* The Company shall not issue any additional stock (or other ownership/equity interests).

*Section 5.16. Transfers of Ownership Interests.* One hundred percent of the ownership interests in the Company is currently owned by the Owners. Owners shall be permitted to transfer ownership interests in the Company to third-parties only in accordance with the provisions of the Franchise Agreement.

## SECTION 6. EVENTS OF DEFAULT AND REMEDIES.

*Section 6.1. Events of Default.* Any one or more of the following shall constitute an *"Event of Default"*:

(a) default in any payment when due under the Note or in any obligation referenced or created in this Agreement or in the Guaranties executed by the Owners or default in the payment when due of any other indebtedness of the Company owing to the Lender;

(b) default in the observance of any of the Company's covenants as provided in this Agreement;

(c) default in the observance of any other provision of this Agreement, which is not remedied within 30 days after notice to the Company by the Lender or the holder of the Note;

(d) default under any evidence of indebtedness of the Company other than as referenced in subparagraphs (a), (b) and (c), above, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such indebtedness;

(e)    any representation or warranty made by the Company in this Agreement proves untrue in any material respect;

(f)    default under any Collateral Document;

(g)    dissolution or termination of existence of the Company;

(h)    the Company becomes insolvent (i.e., is unable to pay its debts as they become due); or

(i)    default by the Company under the Franchise Agreement; a termination of the Franchise Agreement, other than as a result of a default by Lender; a default by the Company in the payment of any amount due pursuant to any obligation under the loan documents executed in connection with the Loan (including the Note and this Agreement) or any other document between the Company and Lender or the Company and any Affiliate of Lender; the entry of a judgment against the Company in excess of $50,000, which is not discharged within 30 days or is not fully covered by insurance; the institution of bankruptcy or similar proceedings by or against the Company, which are not dismissed within 45 days.

*Section 6.2.    Non-Bankruptcy Remedies.*    When any Event of Default has occurred and is continuing, then the entire principal balance of the Note, together with all interest and all fees and charges payable under the Note or this Agreement shall immediately become due and payable, without presentment, demand, protest or notice of any kind, unless and until the Lender or any holder of the Note, by written notice to the Company, shall expressly indicate otherwise.

*Section 6.3.    General Remedies.*    In addition to the foregoing, upon the occurrence of an Event of Default, the Lender may exercise any one of the following remedies, all of which are cumulative and non-exclusive:

(a)    Any remedy contained in this Agreement or in any of the Collateral Documents or available under the UCC or any other law;

(b)    To the extent permitted by applicable law, without notice, demand or legal process of any kind, take possession of any of the Collateral until the Collateral shall be disposed of; and

(c)    Sell any Collateral, at public or private sale, and apply the proceeds of such sale as provided below.

## SECTION 7. ADDITIONAL PROVISIONS REGARDING COLLATERAL AND LENDER'S RIGHTS.

*Section 7.1.    Application of Proceeds of Collateral.*    Any proceeds of any disposition by the Lender of any of the Collateral may be applied by the Lender to the payment of reasonable expenses in connection with the disposition of Collateral,

including attorneys' fees and legal expenses, and any balance of such proceeds may be applied by the Lender toward the payment of the Company's obligations under this Agreement and the Note, and in such order of application, as the Lender may from time to time elect.

Section 7.2. *Lender's Rights*. The following actions may be taken by the Lender at any time:

(i)    acceptance by the Lender of other property as security for the Company's obligations under this Agreement and under the Note;

(ii)    release of its lien on any part of the Collateral or any extension or renewal or release, compromise, alteration or exchange, of any obligations of any guarantor or other obligor with respect to any Collateral; or

(iii)    failure by the Lender to resort to other security or pursue any entity liable for any of the Company's obligations under this Agreement and under the Note before resorting to the Collateral.

## SECTION 8. DEFINITIONS.

The following terms when used in this Agreement shall have the following meanings:

"*Account Receivable*" shall mean any account of the Company and any other right, present or future, of the Company to payment for goods sold or leased or for services rendered, including commissions due, or which may become due, from pending transactions.

"*Affiliate*" shall mean any person or entity (a "*Person*") directly or indirectly controlling or controlled by another Person.

"*Collateral*" is defined in Section 3.1.

"*Collateral Documents*" means the Guaranties, the Pledge Agreements and all other documents as shall secure the Note and the obligations of the Company under this Agreement, including any Supplemental Documents.

"*Contract Right*" shall mean any right of the Company to payment under a contract for the sale or lease of goods or the rendering of services (including listing agreements and agreements with clients, customers and potential buyers of real estate), which right is not yet earned by performance.

"*Default*" shall mean any condition, which, with the lapse of time, the giving of notice, or both, would constitute an Event of Default.

"*Equipment*" shall mean all equipment of the Company of every description and any substitutions and replacements.

"*Event of Default*" shall mean any event or condition identified as such in Section 5.1 of this Agreement.

"*Fixtures*" means all fixtures of the Company and all substitutions and replacements.

"*Franchise Agreement*" shall mean the franchise agreement between the GMAC Real Estate LLC and the Company, as amended from time to time.

"*General Intangibles*" shall mean all general intangibles now owned or later acquired by the Company.

"*Inventory*" shall mean all of the Company's goods and all documents of title or other documents representing the same.

"*Investment Property*" shall mean all of the Company's property that would be included in the term "investment property", as defined in the UCC.

"*Pledge Agreement*" shall mean that certain Pledge Agreement (or each Pledge Agreement, if more than one), dated as of the date of this Agreement, between the Lender and the owners of various interests in the Company.

"*Subsidiary*" shall mean any entity of which 50% or more of the equity interest is owned by the Company.

"*Supplemental Documentation*" is defined in Section 3.5.

"*Total Liabilities*" shall mean the aggregate of all obligations on the balance sheet of the Company determined on a consolidated basis in accordance with generally accepted accounting principles ("**GAAP**").

"*UCC*" shall mean the Uniform Commercial Code as in effect in the State in which the Company operates its business.

Capitalized terms defined elsewhere in this Agreement shall, unless otherwise specified, have the meanings so ascribed to them in all provisions of this Agreement.

## SECTION 9. MISCELLANEOUS.

*Section 9.1.    Holidays*.  If any payment becomes due on a day which is not a bank business day, the due date of such payment shall be extended to the next succeeding bank business day.

*Section 9.2.    No Waiver, Cumulative Remedies*.  No failure on the part of the Lender in the exercise of any right shall operate as a waiver of those rights.

*Section 9.3.    Amendments, Etc.*    No amendment of any provision of this Agreement or of the Note shall be effective unless it shall be in writing and signed by the Lender.

*Section 9.4.    Costs and Expenses.*    The Company agrees to pay, on demand, all reasonable costs of the Lender in connection with a default or the enforcement of this Agreement, the Note and/or the Collateral Documents and in connection with any proceeding brought against the Lender by any person which arises out of the transactions contemplated by this Agreement.

*Section 9.5.    Stamp Taxes.*    The Company agrees to pay on demand any documentary, stamp or similar taxes payable in respect of this Agreement or the Note.

*Section 9.6.    Survival of Representations.*    All representations and warranties made in this Agreement shall survive the execution of this Agreement and of the Note and shall continue in full force and effect with respect to the date as of which they were made, as long as any credit is in use or available under this Agreement.

*Section 9.7.    Payments.*    So long as the Lender is the holder of the Note, the Company will promptly and punctually make all payments when due, without presentment of the Note and without any notation of any such payment being made on such Note.

*Section 9.8.    Addresses for Notices.*    All communications provided for in this Agreement shall be in writing and shall be deemed to have been served (a) on the date when personally delivered, or (b) on the date two days after deposited in the United States mail, certified mail, return receipt requested, postage prepaid, addressed, if to the Company, at 4700 Millenia Boulevard, Suite 310, Orlando, FL 34787, Attention: President, or, if to the Lender, at 2021 Spring Road, Suite 300, Oak Brook, Illinois 60523, Attention: Chief Operating Officer, with a copy to the Lender at 150 Mount Bethel Rd., Warren, NJ 07059, Attention: General Counsel and a copy to GMAC Mortgage Group, Inc, 100 Witmer Road, Horsham, Pennsylvania, 19044, Attention: General Counsel, or at such other address as shall be designated by any party to this Agreement in a written notice served on the other party pursuant to this Section 8.8.

*Section 9.9.    Company's Waiver.*    Except as otherwise provided for in this Agreement or by law, the Company waives (a) presentment, demand and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, one or more extensions or renewals of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Lender on which the Company may in any way be liable and ratifies and confirms whatever the Lender may do in this regard; (b) all rights to notice and a hearing prior to the Lender's taking possession or control of the Collateral or prior to the Lender's reply, attachment or levy on the Collateral or any bond or security which might be required by any court prior to allowing the Lender to exercise any of the Lender's remedies; and (c) the benefit of all valuation, appraisement and exemption laws.    The Company

acknowledges that it has been advised by counsel of its choice with respect to this Agreement and the transactions evidenced by this Agreement.

*Section 9.10. Power of Attorney.* The Company appoints the Lender, or any entity whom the Lender may from time to time designate, as the Company's attorney and agent-in-fact with power (which appointment and power, being coupled with an interest, is irrevocable until all obligations of the Company under this Agreement and the Note are paid and performed in full and this Agreement is terminated), without notice to the Company:

> (a)　after the occurrence and during the continuance of an Event of Default, to endorse the Company's name on any checks or other items of payment and apply such payment to the obligations of the Company owing under this Agreement and under the Note and to endorse the Company's name on any document relating to Accounts Receivable, Inventory or any other Collateral and do all reasonable acts determined by Lender to be necessary to fulfill the Company's obligations under this Agreement, and

> (b)　after the occurrence and during the continuance of an Event of Default, to demand payment of the Accounts Receivable and exercise all the Company's rights with respect to the collection of the Accounts Receivable.

*Section 9.11. Headings.* Article and Section headings used in this Agreement are for convenience of reference only and are not a part of this Agreement for any other purpose.

*Section 9.12. Severability of Provisions.* Any provision of this Agreement which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions or affecting the validity or enforceability of such provision in any other jurisdiction.

*Section 9.13. Counterparts.* This Agreement may be executed in any number of counterparts, and by different parties on separate counterparts, and all such counterparts taken together shall be deemed to constitute the same instrument.

*Section 9.14. Binding Nature, Governing Law, Etc.* This Agreement shall be binding upon the Company and its successors and assigns, and shall inure to the benefit of the Lender and the benefit of its successors and assigns, including any subsequent holder of the Note. The Company may not assign its rights under this Agreement without the written consent of the Lender (which consent shall be within the sole discretion of the Lender). This Agreement constitutes the entire understanding of the parties with respect to the subject matter of this Agreement and any prior agreements, whether written or oral, with respect to the matters covered in this Agreement are superseded by this Agreement. **This Agreement, the Note and the Collateral Documents, and the rights and duties of the parties set forth in those documents, shall be governed by, and construed in accordance with, the internal laws of the State of Illinois, without regard to**

principles of conflicts of laws which would require the application of the laws of a different jurisdiction.

Section 9.15.    Arbitration.    The Company expressly agrees that all controversies, disputes and claims between GMAC Real Estate and its affiliates (and their respective shareholders, officers, directors, agents, and/or employees) and Strategic-Partner (and/or Strategic-Partner's Owners, guarantors, affiliates, and/or employees) arising out of or related to this Agreement, the Note and the Collateral Documents, and the rights and duties of the parties set forth in those documents, must be submitted for binding arbitration in accordance with and subject to the terms of the Arbitration section of the Franchise Agreement, and all such terms are incorporated by reference as if fully set forth herein, provided that all references to the "Agreement" therein shall be deemed to refer to this Agreement, the Note or the Collateral Documents as the context so requires.

Section 9.16.    Waiver of Jury Trial.    **THE COMPANY AND THE LENDER EACH IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE, THE COLLATERAL DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED BY THESE DOCUMENTS.**

Section 9.17.    Further Assurances.    The Company agrees to take such actions relating to this Agreement, the Note and the Collateral Documents as the Lender may reasonably request in order to more effectively carry out the terms and provisions of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their duly authorized officers as of the day and year first above written.

COMPANY:

Signature Realty & Development, Inc.

By: *M. Susan McIntyre*
    M. Susan McIntyre

LENDER:

By:_____
    Judith O'Brien
Its: Vice President

**Exhibit A To The Loan And Security Agreement**
**Note**

**SCHEDULES**

SCHEDULE 4.4 (LITIGATION): NONE

SCHEDULE 4.8 (LOCATIONS OF OFFICES, BOOKS AND RECORDS, INVENTORY AND EQUIPMENT): NONE

SCHEDULE 4.9 (REAL PROPERTY WHERE FIXTURES ARE LOCATED): NONE

SCHEDULE 4.10 (PATENTS, COPYRIGHTS, ETC.): NONE

**Exhibit E**

3/2004 Reg. Fran. Agmt
CHGO1/30423577.4

A-1

# TERM LOAN AND SECURITY AGREEMENT

**TERM LOAN AND SECURITY AGREEMENT**, dated as of (April , 2000) (this *"Agreement"*), between Signature Realty & Development Inc., a Florida corporation ("*Company*") and GMAC Home Services, Inc., ("*Lender*"), a Delaware corporation . Capitalized terms used and not otherwise defined in this Agreement shall have the meanings ascribed to such terms in Section 7 of this Agreement .

## WITNESSETH THAT:

**WHEREAS**, concurrently herewith Company has borrowed from Lender the sum of Four Hundred Thousand Dollars ($400,000.00), as evidenced by that certain Term Loan Note (the "*Note*") in the form attached hereto as Exhibit A; and

**WHEREAS**, Company and Lender are entering into this Agreement to set forth, in part, the terms and conditions applicable to the Note and the covenants, agreements, representations and warranties of Company made in connection with the Note.

**NOW, THEREFORE**, for good and valuable consideration, the parties agree as follows:

SECTION 1.    PAYMENTS.

*Section 1.1.    Voluntary Prepayments.*    Company shall have the privilege of prepaying the Note, in whole or in part, without penalty, fee or charge, but, if in part, then in an amount of not less than $100,000. Each prepayment shall be applied, first, to any accrued interest and, thereafter, to principal. All such prepayments shall be applied to installments in the inverse order of their maturity.

*Section 1.2.    Place and Application of Payments.*    All payments shall be made to Lender as designated by Lender, in writing.

SECTION 2:    SECURITY.

*Section 2.1.    Grant of Security Interest.*    As security for the payment of all amounts owing to Lender and as security for the satisfaction of all other obligations of Company to Lender, Company grants to Lender a first priority, continuing security interest in the following property of Company, including property presently owned or later acquired (together, the "*Collateral*"): accounts receivable, cash, cash equivalents, commissions due on pending transactions, equipment and fixtures, inventory, general intangibles, contract rights and documents of title, investment property, chattel paper, instruments evidencing any obligations to Company by third parties, monies or property of Company held by Lender (excluding property of Company held by Lender in escrow for third parties), all other personal property of Company, and replacements, substitutions, additions, accessions, products or proceeds to or for any of the foregoing.

*Section 2.2.    Accounts Receivable.*

(a)    Without the prior written consent of Lender, after the occurrence of a Default or Event of Default, no credit allowance shall be granted by Company to any account debtor.

(b)    Company warrants that all of the accounts receivable are bona fide existing obligations and all documents furnished to Lender in connection therewith are genuine.

(c)    Lender is authorized at any time after the occurrence and during the continuance of an Event of Default:

(i)    To request confirmation of the amount shown by the accounts receivable or other Collateral;

(ii)    To endorse in Company's name and to collect any items of payment received by Lender in payment of any Account Receivable or other obligation owing to Company;

(iii)    To notify any entity of the fact of Lender's lien and of the collateral assignment to Lender;

(iv)    To direct any entity obligated under any Collateral to make payment directly to Lender of any amounts due or to become due; and

(v)    To deal with any Collateral in a commercially reasonable manner.

Under no circumstances shall Lender be under any duty to act in regard to any of the foregoing matters. The costs, including reasonable attorneys' fees, shall be borne solely by Company.

*Section 2.3.    Inventory.*

(a)    Company warrants that: (i) all of the Inventory is, and at all times shall be, owned by Company free of all liens (except as set forth in Section 4.8); and (ii) Company will not make any further assignment for security of, or create or permit to exist any further lien on, the Inventory.

(b)    Lender shall not be liable for the safekeeping of any inventory delivered to it, except for such loss as shall result from Lender's gross negligence or willful misconduct.

*Section 2.4.    Equipment.*

(a)    Company shall keep the equipment in adequate operating condition, ordinary wear and tear excepted, and Company shall not transfer any equipment; *provided, however*, that, without Lender's consent (but with notice to Lender), Company may dispose of equipment in the ordinary course of business, provided the equipment disposed of in any fiscal year has an aggregate market value of Ten Thousand Dollars ($10,000) or less and Company receives fair market value in return.

(b)    Company will, upon request of Lender, submit to Lender a current list of all of Company's equipment.

*Section 2.5.    Supplemental Documentation.*    At Lender's request, Company shall deliver to Lender such documentation ("*Supplemental Documentation*") reasonably requested by Lender to perfect Lender's security interest in the Collateral.

*Section 2.6.    Collateral for the Benefit of Lender.*    All security interests granted to Lender and all Collateral shall be deemed to have been granted to Lender to secure the obligations of Company to Lender under this Agreement and the Note.

011.301914.3

SECTION 3.   REPRESENTATIONS AND WARRANTIES.

Company represents and warrants to Lender as follows:

Section 3.1.   Authorization; Enforceability; etc.   Company is a corporation, duly organized, validly existing, and in good standing under the laws of the State of Florida, and is duly licensed or qualified and in good standing in all jurisdictions wherein the nature of its activities or business conducted or property owned or leased by it requires such qualification or licensing.   Company is in compliance with the terms of this Agreement and has the authority to enter into this Agreement and to execute the Note and the Collateral Documents, which actions will not violate any provision of law or of the articles or certificate of incorporation or organization or by-laws of Company or any agreement affecting Company or any of its property.

Section 3.2.   Subsidiaries.   Company has no Subsidiaries, except as set forth on the Company Schedule.

Section 3.3.   Accuracy of Information.   All financial statements for Company previously submitted to Lender are correct, have been prepared in accordance with GAAP, consistently applied, and accurately reflect the financial condition of Company and the results of the operations and cash flows for Company as of the dates thereof and for the periods covered thereby.   Company has no contingent liabilities which are material to it, other than as indicated on such financial statements (including no contingent liability for Y2K compliance), and, since the date of the latest of such financial statements, there have been no material adverse changes in the financial condition or in the assets or liabilities of Company, nor any other changes, except those occurring in the ordinary course of business.

Section 3.4.   Litigation; Taxes.   Except as set forth on the Company Schedule, there is no litigation or governmental proceeding pending, nor threatened (to the best knowledge of Company), against Company which, if adversely determined, would result in any material adverse change in the financial condition or properties, business or operations of Company.   All tax returns required to be filed by Company have, in fact, been filed, and all taxes and other charges upon Company or upon any of its property, income or franchises have been paid.

Section 3.5.   ERISA/RESPA   Company is in compliance in all material respects with ERISA and RESPA.

Section 3.6.   Title to Property.   Company has good title to all of the property encumbered hereby and by the Collateral Documents.   Lender has a first priority perfected security interest in all of the Collateral.

Section 3.7.   Compliance With Laws.   Company is in compliance in all material respects with all applicable local, state and federal statutes and regulations.

Section 3.8.   Business and Collateral Locations.

(a)   The offices where Company keeps its books and records are located at the addresses so designated on the Company Schedule.

(b)   The Company's inventory and equipment are located at the addresses so designated on the Company Schedule.

Section 3.9.   Real Property.   The addresses and legal descriptions of any real property owned by Company or third parties, on which fixtures are located, are as set forth on the Company Schedule.

Section 3.10.   Licenses, Patents, Trademarks, etc., Company possesses adequate licenses, patents, etc. to continue to conduct its business as previously conducted by it.

Section 3.11.   Year 2000.   Company has reviewed the areas within its business and operations which could be adversely affected by, and has developed or is developing a program to address on a timely basis, the risk that computer applications used by Company may be unable to recognize and perform properly date-sensitive functions involving certain dates prior to and any date after December 31, 1999, and has made related appropriate inquiry of material suppliers and vendors.   Based on such review and program, Company represents and warrants to Lender that the Y2K problem will not have a material adverse effect on Company.

Section 3.12.   Name.   Company has used no other name other than the names set forth as Company's name in the introductory paragraph of this Agreement and has filed no "doing business as" certificate or other similar document with respect to its use of any other name, except as set forth on the Company Schedule.

SECTION 4.   COVENANTS.

Company hereby covenants and agrees with Lender as follows:

Section 4.1.   Maintenance of Business.   Company shall keep in force and effect all licenses and permits necessary to the proper conduct of its business.

Section 4.2.   Maintenance.   Company shall keep its properties and equipment in good working order.

Section 4.3.   Taxes.   Company shall duly pay all taxes and similar charges against Company or any of its property before the same become delinquent.

Section 4.4.   Insurance.   Company shall keep insured all insurable property owned by Company against loss or damage from fire and such other hazards or risks as are customarily insured against by companies similarly situated and Company shall similarly insure employers' and public liability risks.   Company shall furnish to Lender a current certificate of such insurance, naming Lender as an additional insured.

Section 4.5.   Financial Reports and Other Information.   Company shall maintain a method of accounting consistent with GAAP and shall furnish to Lender such information respecting the business affairs, operations and financial condition of Company as may be reasonably requested; and without any request shall furnish to Lender:

(a)   Within 30 days after the last day of each calendar month, an income statement of Company for the month and the fiscal year-to-date period then ended and a balance sheet of Company as at said date, in each case prepared by Company in reasonable detail showing in comparative form:   (i) the figures for the corresponding date and period in the previous fiscal year; and (ii) the budgeted results for such period and certified to by the President or chief financial officer of Company;

(b)   Within 15 days after the last day of each calendar quarter, a list setting forth the number of all real estate listing agreements to which Company is a party, a list setting forth the number of all executed contracts for sale with respect to which Company expects to receive a brokerage commission (setting forth the expected amount of the commission to be paid to Company), and the number of closings which occurred during such calendar quarter and the gross commission income of Company received with respect thereto;

011.301914.3

-2-

(c)  Within 60 days after the end of each fiscal year, a copy of the balance sheet as at said date and the statement of stockholders' equity, income statement and statement of cash flows of Company for the 12-month period then ended for Company, all as prepared in accordance with GAAP, consistently applied;

(d)  Promptly, after knowledge thereof shall have come to the attention of any officer of Company, written notice of any threatened or pending litigation or governmental proceeding against Company which would have a material adverse effect on the business and properties of Company and/or would trigger the occurrence of any Default or Event of Default; and

(e)  Promptly, of any change in any of the information set forth on the Schedules attached hereto.

Each of the financial statements furnished to Lender pursuant to subsections (a) and (c), above, shall be accompanied by a certificate signed by the President or chief financial officer of Company in substantially the format of Exhibit B, attached hereto.  Lender shall, at all reasonable times, have full access to Company's books, records, files and audits.

*Section 4.6.*  *Minimum Net Worth.*  Company will at all times maintain Net Worth of not less than $35,000.

*Section 4.7.*  *Maximum Total Liabilities to Net Worth Ratio.*  Company will at all times maintain a ratio of Total Liabilities to Net Worth of not more than 12:1.

*Section 4.8.*  *Liens.*  Company shall not encumber or permit to exist upon or be subject to any liens or security interest any property owned by Company; provided, however, that the foregoing shall not operate to prevent:

(a)  The liens and security interests created by the Collateral Documents and other liens and security interests granted in favor of Lender;

(b)  Liens by the vendor in respect of equipment acquired by Company, provided that the sum of the aggregate principal amount at any one time remaining unpaid on the indebtedness so secured, when taken together with the aggregate outstanding liability of Company in respect of capitalized equipment leases, does not exceed $25,000; and

(c)  Liens set forth on the Company Schedule.

*Section 4.9.*  *Additional Borrowings and Guaranties.*  Company shall not incur any indebtedness for borrowed money or become liable (including a contingent liability) for any obligation of any other entity; provided, however, that the foregoing shall not operate to prevent:

(a)  Indebtedness of Company on the Note and other indebtedness of Company owing to Lender;

(b)  Liability of Company in respect of leases of equipment which should be capitalized under GAAP consistently applied, provided that such liability aggregates not more than $25,000 at any one time outstanding;

(c)  Purchase money indebtedness secured by the liens permitted by Section 4.8(b); and

(d)  Indebtedness or liabilities set forth on the Company Schedule.

*Section 4.10.*  *Acquisitions, Investments and Advances.*  Company shall not, without the prior written consent of Lender, make any investments or loans to any other entity or supply funds to any other entity or acquire any substantial part of the assets or business of any other entity.

*Section 4.11.*  *Dividends and Certain Other Restricted Payments.*  Company shall not during any fiscal year (a) declare or pay any dividends on its capital stock of any series or class, whether now or hereafter authorized or issued; or (b) directly or indirectly purchase, redeem or otherwise require or retire any such capital stock; or (c) make any other distribution of any kind or character in respect of its capital stock; *provided that*, with the prior written consent of Lender, Company shall be permitted to make cash distributions to its sole shareholder, Thomas E. McIntyre.

*Section 4.12.*  *Formation of Subsidiaries.*  Company shall not form or acquire or permit to exist any Subsidiary without the prior written consent of Lender, other than those set forth on the Company Schedule.

*Section 4.13.*  *Mergers, Consolidations and Sales.*  Company shall not transfer a substantial part of its property and shall not consolidate or be a party to a merger with any other entity.  The term "substantial" shall mean the transfer in any fiscal year of five percent (5%) or more of such property.

*Section 4.14.*  *ERISA.*  Company shall promptly pay all obligations arising under ERISA.

*Section 4.15.*  *Contracts With Affiliates.*  Company shall not enter into with an Affiliate any contract, agreement or business arrangement on terms and conditions which are less favorable to Company than would be usual and customary in similar contracts between Persons not affiliated with each other.

*Section 4.16.*  *Franchise Agreement.*  Company shall take all actions necessary to keep the Franchise Agreement in full force and effect and shall promptly fulfill all of its obligations.

*Section 4.17.*  *Issuance of Capital Stock.*  Company shall not issue any additional stock or other equity interests.

*Section 4.18.*  *Additional Covenants.*  Company shall satisfy all additional covenants set forth on the Company Schedule.

SECTION 5.  EVENTS OF DEFAULT AND REMEDIES.

*Section 5.1.*  *Events of Default.*  Any one or more of the following shall constitute an *"Event of Default"*:

(a)  Default in the payment when due of any principal of, or interest on, the Note or any obligation due under this Agreement or default in the payment when due of any other indebtedness of Company owing to Lender;

(b)  Default in the observance of any of Company's covenants set forth in Section 4;

(c)  Default in the observance of any other provision of this Agreement, which is not remedied within 30 days after notice to Company by Lender or the holder of the Note;

(d)  Default under:  (i) any evidence of indebtedness of Company other than as referenced in paragraphs (a), (b) and (c), above, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such indebtedness; or (ii) the Franchise Agreement;

(e)  Representation or warranty made by Company herein proves untrue in any material respect;

(f)  Default under any Collateral Document;

(g)  Judgment in an amount of $50,000.00 or more is entered against Company, which remains unvacated for a period of 60 days or is not fully payable under an existing policy of insurance;

(h)  Dissolution or termination of existence of Company;

(i)  Company becomes insolvent (i.e., is unable to pay its debts as they become due) or bankruptcy or similar proceedings are instituted against Company;

(j)  Company institutes bankruptcy or similar proceedings or consents to the institution of such proceedings against it by others or admits, in writing, its inability to pay its debts as they mature;

(k)  Thomas E. McIntyre ceases to own 100% of the stock (or similar equity interest) of Company or ceases to maintain the ability to control the management of Company; or

(l)  Any other Event of Default set forth on the Company Schedule occurs and continues.

Section 5.2.  Specific Remedies.  When an Event of Default has occurred and is continuing, then the entire principal balance of the Note and all interest thereon and all fees and charges payable under this Agreement shall immediately become due and payable, without presentment, demand, protest or notice of any kind, unless and until Lender or any holder of the Note, by written notice to Company, shall expressly indicate otherwise.

Section 5.3.  General Remedies.  In addition to the foregoing, upon the occurrence of an Event of Default, Lender may exercise any one of the following remedies, all of which are cumulative and non-exclusive:

(a)  Any remedy contained in this Agreement or in any of the Collateral Documents or available under the UCC, or any other law;

(b)  To the extent permitted by applicable law, without notice, demand or legal process of any kind, take possession of any of the Collateral until the same shall be disposed of; and

(c)  Sell any Collateral, at public or private sale, and apply the proceeds thereof as provided below.

SECTION 6.  ADDITIONAL PROVISIONS REGARDING COLLATERAL AND LENDER'S RIGHTS.

Section 6.1.  Application of Proceeds of Collateral.  The proceeds of any disposition by Lender of any of the Collateral may be applied by Lender to the payment of reasonable expenses in connection with the disposition of the Collateral, including reasonable attorneys' fees and legal expenses, and any balance of such proceeds may be applied by Lender toward the payment of Company's obligations under this Agreement and the Note, and in such order of application as Lender may, from time to time elect.

Section 6.2.  Lender's Rights.  The following actions may be taken by Lender at any time:

(a)  Acceptance by Lender of other property as security for Company's obligations hereunder and under the Note;

(b)  Release of its lien on any part of the Collateral or any extension or renewal or release, compromise, alteration or exchange, of any obligations of any guarantor or other obligor with respect to any Collateral; or

(c)  Refusal by Lender to resort to other security or pursue any entity liable for any of Company's obligations hereunder and under the Note before resorting to the Collateral.

SECTION 7.  DEFINITIONS.

The following terms when used herein shall have the following meanings:

"Affiliate" shall mean any Person directly or indirectly controlling or controlled by another Person.

"Collateral" shall have the meaning set forth in Section 2.1.

"Collateral Documents" shall mean this Agreement, the Pledge Agreement and all other documents as shall secure the Note and the obligations of Company hereunder, including any Supplemental Documentation.

"Company Schedule" shall mean the Loan Agreement Schedule delivered by Company in connection with the transaction contemplated by this Agreement.

"Default" shall mean any event or condition which, with the lapse of time, the giving of notice, or both, would constitute an Event of Default.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Event of Default" shall mean any event or condition identified as such in Section 5.1 hereof.

"Franchise Agreement" shall mean that certain franchise agreement between Lender and Company, dated as of _Feb. 1, 1999_ , together with all amendments thereto.

"GAAP" shall mean generally accepted accounting principles.

"Net Worth" shall mean the total shareholders' equity (including capital stock, additional paid-in-capital and retained earnings after deducting treasury stock, but excluding minority interests in any other entity) which would appear on the balance sheet of Company determined on a consolidated basis in accordance with GAAP.

"Person" shall mean any person, firm, corporation or entity.

"Pledge Agreement" shall mean the pledge agreement(s) dated as of the date hereof set forth on the Company Schedule.

"RESPA" shall mean the Real Estate Settlement Procedures Act.

"Subsidiary" shall mean any entity of which 50% or more of the equity interest is owned by Company.

"Supplemental Documentation" shall have the meaning set forth in Section 2.5.

"*Total Liabilities*" shall mean the aggregate of all obligations on the balance sheet of Company determined on a consolidated basis in accordance with GAAP.

"*U.C.C.*" shall mean the Uniform Commercial Code as in effect in the state in which the Collateral is located.

"*Y2K*" shall mean the year 2000.

Capitalized terms defined elsewhere in this Agreement shall, unless otherwise specified, have the meanings so ascribed to them in all provisions of this Agreement.

SECTION 8.    MISCELLANEOUS.

Section 8.1.    *Holidays.*    If any payment becomes due on a day which is not a bank business day, the due date of such payment shall be extended to the next succeeding bank business day.

Section 8.2.    *No Waiver, Cumulative Remedies.*    No failure on the part of Lender in the exercise of any right shall operate as a waiver thereof.

Section 8.3.    *Amendments, Etc.*    No amendment of any provision of this Agreement or of the Note shall in any event be effective unless the same shall be in writing and signed by Lender and Company.

Section 8.4.    *Costs and Expenses.*    Company agrees to pay on demand all reasonable costs and expenses of Lender in connection with the negotiation, preparation, execution and delivery of this Agreement, the Note, the Collateral Documents, and the other instruments and documents to be delivered hereunder and in connection with the transactions contemplated hereby or thereby, and all reasonable costs and expenses of Lender in connection with any consents hereunder or thereunder or waivers or amendments herein or thereto, including the reasonable fees and out-of-pocket expenses of counsel for Lender, with respect to all of the foregoing, and all costs and expenses (including reasonable attorneys' fees), if any, incurred by Lender or any other holder of the Note in connection with a default or the enforcement of this Agreement, the Note, the Collateral Documents, and the other instruments and documents to be delivered hereunder and in preserving or protecting or exercising the rights of Lender hereunder or thereunder or with respect to any collateral security for the Note or other liabilities and in connection with any action, suit or proceeding brought against Lender by any person which arises out of the transactions contemplated hereby or thereby or out of any action or inaction by Lender hereunder or thereunder, including all of the foregoing incurred in any bankruptcy, arrangement or reorganization proceeding involving Company.

Section 8.5.    *Stamp Taxes.*    Company agrees to pay, on demand, any documentary, stamp or similar taxes payable in respect of this Agreement or the Note.

Section 8.6.    *Survival of Representations.*    All representations and warranties made herein shall survive the execution of this Agreement and of the Note and shall continue in full force and effect with respect to the date as of which they were made, as long as any credit is in use or available hereunder.

Section 8.7.    *Payments.*    So long as Lender is the holder of the Note, Company will promptly and punctually pay the principal of, and interest on, such Note without presentment of the Note and without any notation of any such payment being made on such Note.

Section 8.8.    *Addresses for Notices.*    All communications provided for herein shall be in writing and shall be deemed to have been served (a) on the date when personally delivered, or (b) on the date three days after deposited in the United States mail, return receipt requested, postage prepaid, addressed, if to Company, at the address set forth on the Company Schedule, or, if to Lender, at 477 Martinsville Road, Post Office Box 880, Liberty Corner, New Jersey 07938, Attention: Brian Peterson, with a copy to Lender at the above address, Attention: General Counsel and a copy to GMAC Mortgage, 100 Witmer Road, Horsham, Pennsylvania 19044, Attention: General Counsel, or at such other address as shall be designated by any party hereto in a written notice served on the other party pursuant to this Section 8.8.

Section 8.9.    *Company's Waiver.*    Except as otherwise provided for in this Agreement, Company waives (a) presentment, demand and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, extensions or renewals of any commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Company may be liable; (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or Lender's reply, attachment or levy on or of, the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of Lender's remedies; and (c) the benefit of all valuation, appraisement and exemption laws. Company acknowledges that it has been advised by counsel of its choice with respect to this Agreement and the transactions evidenced by this Agreement.

Section 8.10.    *Power of Attorney.*    Company appoints Lender, or any entity whom Lender may from time to time designate, as Company's attorney and agent-in-fact with power (which appointment and power, being coupled with an interest, is irrevocable until all obligations of Company under this Agreement and the Note are paid and performed in full and this Agreement is terminated), without notice to Company:

(a)    After the occurrence and during the continuance of an Event of Default, to endorse Company's name on any checks or other items of payment and apply such payment to the obligations of Company owing hereunder and under the Note and to endorse Company's name on any document relating to accounts receivable, inventory or any other Collateral and do all reasonable acts determined by Lender to be necessary to fulfill Company's obligations under this Agreement, and

(b)    After the occurrence and during the continuance of an Event of Default, to demand payment of the accounts receivable and exercise all Company's rights with respect to the collection of the accounts receivable.

Section 8.11.    *Headings.*    Article and Section headings used in this Agreement are for convenience of reference only and are not a part of this Agreement for any other purpose.

Section 8.12.    *Severability of Provisions.*    Any provision of this Agreement which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 8.13.    *Counterparts.*    This Agreement may be executed in any number of counterparts; and by different parties hereto on separate counterparts, and all such counterparts taken together shall be deemed to constitute one and the same instrument.

Section 8.14.    *Binding Nature, Governing Law, Etc.*    This Agreement shall be binding upon Company and its successors and assigns and shall inure to the benefit of Lender and the benefit of its successors and assigns, including any subsequent holder of the Note. Company may not assign its rights hereunder without the written consent of Lender. This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby. This Agreement, the Note and the Collateral Documents, and the rights and duties of the parties hereto and thereto, shall be governed by, and construed in accordance with, the internal laws of the State of New Jersey, without regard to principles of conflicts of laws which would require the application of the laws of a different jurisdiction.

011.301914.3

-5-

Section 8.15.    *Submission to Jurisdiction; Waiver of Jury Trial.*   Company hereby submits to the exclusive jurisdiction of the United States District Court for the District of New Jersey with respect to all legal proceedings arising out of or relating to this Agreement, the Note, the Collateral Documents or the transactions contemplated hereby or thereby.  Company irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  Company and Lender each hereby irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement, the Note, the Collateral Documents or the transactions contemplated hereby or thereby.

Section 8.16.    *Further Assurances.*   Company agrees to take such actions relating to this Agreement, the Note and the Collateral Documents as Lender may reasonably request in order to more effectively carry out the terms and provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers as of the day and year first above written.

COMPANY:
SIGNATURE REALTY & DEVELOPMENT INC.

By: _____
Name:  Thomas B. McIntyre
       Its:  Owner/President

LENDER:
GMAC HOME SERVICES, INC.

By: _____
    Ronald J. Lyle
       Its:  Chief Financial Officer

11.301814.3                              --6--

08CV3950
JUDGE ZAGEL
MAGISTRATE JUDGE COLE
EDA

# EXHIBIT B

## AMERICAN ARBITRATION ASSOCIATION

GMAC REAL ESTATE, LLC,                    )
                                          )
    **Complainant,**                    )
                                          )
v.                                        )        No:
                                          )
SIGNATURE REALTY & DEVELOPMENT,           )
INC., d/b/a SIGNATURE and d/b/a           )
SIGNATURE REAL ESTATE, M. SUSAN           )
McINTYRE and JAN WALKER                   )
                                          )
    **Respondents.**                    )

### DEMAND FOR ARBITRATION

Complainant, GMAC Real Estate, LLC ("GMACRE"), by its attorneys, Williams Montgomery & John Ltd. for its Demand against Respondents, Signature Realty & Development, Inc. d/b/a Signature, and d/b/a Signature GMAC Real Estate ("Signature"), M. Susan McIntyre ("McIntyre") and Jan Walker ("Walker"), alleges as follows:

### Parties

1.    GMACRE is a limited liability company organized and existing under the laws of the State of Delaware having its principal place of business in the State of Illinois. GMACRE is engaged in the business of granting to others ("franchisees") the right to operate residential real estate brokerage offices using various trade and service marks, including the mark "GMAC® Real Estate" (the "GMAC Marks").

2.    Upon information and belief, McIntyre and Walker are residents and citizen of the State of Florida. McIntyre and Walker are former franchisees of GMACRE.

3.    Upon information and belief, Signature is a corporation organized and existing under the laws of the State of Florida. Signature is a former franchisee of GMACRE.



EXHIBIT

B

4.    This is an action for breach of contract, trademark infringement, false designation as to origin, and trademark dilution under the Federal Trademark (Lanham) Act, 60 Stat. 427, 15 U.S.C. § 1051 *et seq.,* common law trademark infringement, unfair competition, and deceptive trade practices under the statutes and common law.

5.    For many years prior to the acts complained of herein, GMAC has been continuously engaged in the business of operating a real estate franchise system.

### Facts Common To All Counts

### The Parties' Written Real Estate Service Contract

6.    Beginning in approximately late 1998 Signature became a franchisee of GMACRE pursuant to an agreement.  On or about March 18, 2005, McIntyre and Walker entered into a series of new written GMAC Real Estate, LLC Real Estate Franchise Agreements (collectively "Franchise Agreement") with GMACRE pursuant to which GMACRE granted Signature, McIntyre and Walker the right to operate numerous residential real estate franchise offices in Florida.  Signature, McIntyre and Walker signed a separate Franchise Agreement for each residential real estate office, including the following:

(a)    4700 Millenia Blvd., Orlando, Florida (Exhibit A);

(b)    13524 Summerport Village Parkway, Windermere, Florida (Exhibit B);

(c)    147 Lyman Ave., Winter Park, Florida (Exhibit C);

(d)    4250 Alafaya Trail, Oviedo, Florida (Exhibit D);

(e)    8925 West Colonial Drive, Ocoee Florida (Exhibit E);

(f)    4247 Lake Mary Blvd., Lake Mary, Florida (Exhibit F);

(g)    3171 West Vine St., Kissimmee, Florida (Exhibit G);

2

    (h)    1710 E. Highway 50, Clermont, Florida (Exhibit H);

    (i)    813 N. Atlantic Ave., Cocoa Beach, Florida (Exhibit I); and

    (j)    7932 West Sand Lake Rd., Orlando, Florida (Exhibit J).

A true and correct copy of each Franchise Agreement is attached hereto as Exhibits A through J, respectively.

    7.    Under each Franchise Agreement, Signature, McIntyre and Walker received, among other things, a limited license to use the GMAC Real Estate Marks in connection with the operation of that office. (See Section 3 of each Franchise Agreement.) The term of each Franchise Agreement was approximately ten (10) years.

    8.    Under the Franchise Agreement, Signature, McIntyre and Walker agreed, among other things, to pay to GMACRE certain fees, including Royalty Fees, Referral Fees, Referral Office Fees, Advertising Fees, and Business Conference Registration Fees. The Royalty Fees, which were due and payable on a monthly basis, were computed as a percentage of the commissions and fees income Signature, McIntyre and Walker generated from the sale of residential real property at each location. Signature, McIntyre and Walker also agreed to pay GMACRE a monthly Advertising Fee computed as a percentage of the commissions and fees income collected.

    9.    Under Section 18 of the Franchise Agreement, it is an event of default, and grounds for termination of the Franchise Agreement, if Signature, McIntyre and Walker failed to comply with their payment obligations and failed to cure that breach within 30 days after their receipt of notice of breach. Under Section 18(f) Cross-Default, a Default of any Signature Franchise Agreement constitutes a Default for every Signature location.

3

10.     Under Paragraph 23 of the Franchise Agreement any dispute with respect to the Agreement "must be submitted for arbitration . . . to the American Arbitration Association (AAA)." All arbitrations are to be conducted in the Chicago Illinois Metropolitan Area and in accordance with AAA's current commercial arbitration rules.

### Signature, McIntyre and Walker's Failure to Pay GMACRE
### the Amounts Due Under the Franchise Agreement

11.     By letter dated March 15, 2007, GMACRE advised Signature, McIntyre and Walker that they were in default of their obligations under the Franchise Agreement for failing to make payments required under the Franchise Agreement. The March 15, 2007 letter advised Signature, McIntyre and Walker that if they failed to fully cure each default within 30 days of the date of the letter, the Franchise Agreement, including each Franchise Agreement for each Signature location, "Sister Agreements," could be terminated. A true and correct copy of the March 15, 2007 letter is attached hereto as Exhibit K.

12.     Signature, McIntyre and Walker did not cure the default referenced in the March 15, 2007 letter.

13.     Accordingly, on July 5, 2007, GMACRE sent Signature, McIntyre and Walker a Notice of Termination advising them that the Franchise Agreement and Sister Agreements were terminated. A true and correct copy of the July 5, 2007 Notice of Termination is attached hereto as Exhibit L. The July 5, 2007 Notice reminded Signature, McIntyre and Walker of their post-termination obligations under the Franchise Agreements, including their obligation to pay to GMACRE all fees, charges and other amounts due to GMACRE, as well as all losses sustained by GMACRE as a result of the early termination of the Franchise

4

Agreement. The Notice also advised Signature, McIntyre and Walker that within 10 days they must cease the use of the GMAC Real Estate Mark.

14.    Signature, McIntyre and Walker have failed and refused to pay these outstanding amounts to GMACRE, the sum of which is at least $2,054,318 remains due and owing to GMACRE.

15.    Under the Franchise Agreements, Signature, McIntyre and Walker agreed to reimburse GMACRE for all of the costs it incurred, including reasonable attorneys' fees, in enforcing their post-termination payment obligations.

16.    McIntyre also executed an Endorsement of Principals agreeing to be personally bound by the provisions of the Franchise Agreement relating to, among others, and financial obligations and use of the marks after default.

17.    Subsequent to the termination of the Franchise Agreement and for a considerable time thereafter including, on information and belief, through the filing of this arbitration Signature, McIntyre and Walker continue to use the GMAC Real Estate Marks and logo in their advertising, website, and sales in direct violation of Section 19 of the Franchise Agreement.

18.    GMACRE has fully performed its obligations under the Franchise Agreement.

### The Parties' Written Franchise Development Costs Note

19.    On or about March 1, 2005, Signature entered into a written Franchise Development Costs Note (the "Note") with GMACRE in the amount of $248,736.80. A true and correct copy of the Franchise Development Note is attached hereto and made a part hereof as Exhibit M.

5

20.    On or about March 18, 2005, McIntyre executed a Personal Guaranty of Note, unconditionally guarantying the payment of the Note to GMAC.  A true and correct copy of the Personal Guaranty of Note is attached hereto as Exhibit N.

21.    As of the date of termination of the Franchise Agreement solely due to the default of Signature, McIntyre and Walker there remained due and owing on the note a balance of $194,999.95 which remains unpaid.

## Non-Compete Agreement

22.    Pursuant to Section 8 of the Franchise Agreement, Signature and McIntyre and Walker as owners of Signature, agreed to a non-compete provision.

23.    Specifically, Signature, McIntyre and Walker agreed that for the Term of the Franchise Agreement they would not directly or indirectly "establish or have an interest in: (a) any real estate brokerage franchising or similar system or service, . . . (b) any real estate brokerage operation or business or real estate information center, . . . or (c) any business offering real estate settlement services and/or products . . ." (See Exhibit A, Section 8.)

24.    To date, Signature, McIntyre and Walker continue to directly and indirectly provide and/or have an interest in a real estate brokerage business.

## COUNT I

### (Breach of Contract – Franchise Agreement)

25.    GMACRE realleges and incorporates by reference paragraphs 1 through 24 of its Demand as Paragraph 25, as if fully set forth herein.

6

26.    Signature, McIntyre and Walker breached the Franchise Agreement by, among other things, failing and refusing to pay Royalty Fees and other fees and charges due GMACRE.

27.    As a direct and proximate result of Signature, McIntyre and Walker's breaches of the Franchise Agreement, GMACRE has suffered damages in an amount in excess of $2,054,318.

WHEREFORE, Complainant prays for an entry of a judgment against Respondents in the amount of $2,054,318 plus all attorneys fees and costs associated with this action plus all pre and post judgment interest.

## COUNT II

### (Breach of Contract Against Signature - Note)

28.    GMACRE realleges and incorporates by reference paragraphs 1 through 27 of its Demand as Paragraph 28, as if fully set forth herein.

29.    Signature has breached the Note by, among other things, failing and refusing to pay the balance due and owing to GMACRE.

30.    As a direct and proximate result of Signature's breaches of the Note, GMACRE has suffered damages in an amount in excess of $194,999.

WHEREFORE, Complainant prays for an entry of a judgment against Respondents in the amount of $194,999.95 plus all attorneys fees and costs associated with this action plus all pre and post judgment interest.

## COUNT III

### (Breach of Contract Against McIntyre – Personal Guaranty)

7

31.    GMACRE realleges and incorporates by reference paragraphs 1 through 30 of its Demand as Paragraph 31, as if fully set forth herein.

32.    McIntyre has breached the Personal Guaranty of Note by, among other things, failing and refusing to pay the balance due and owing to GMACRE.

33.    As a direct and proximate result of Signature's breaches of the Note and McIntyre's breaches of the Personal Guaranty of Note, GMACRE has suffered damages in an amount in excess of $194,999.

WHEREFORE, Complainant prays for an entry of a judgment against McIntyre in the amount of $194,999.95 plus all attorneys fees and costs associated with this action plus all pre and post judgment interest.

## COUNT IV

**(Breach of Contract Against Signature, McIntyre and Walker – Non-Compete)**

34.    GMACRE realleges and incorporates herein by reference paragraphs 1 through 33 of this Demand as if fully set forth herein

35.    Signature, McIntyre and Walker breached the Franchise Agreement by, among other things, continuing to directly or indirectly provide real estate brokerage services in violation of Section 8 of the Franchise Agreement.

36.    As a direct and proximate result of Signature, McIntyre and Walker's breaches of the Franchise Agreement, GMACRE has suffered and continues to suffer damages in an amount to be calculated at the arbitration.

WHEREFORE, Complainant prays for an entry of judgment against Respondents as follows:

8

A.    For an order prohibiting Respondents from directly or indirectly being affiliated with, or having any interest in: (i) any real estate brokerage franchising or similar system or service, other than one operated by Complainant; (ii) any real estate brokerage operation or business or real estate information center, which is not licensed by Complainant; and (iii) any business offering real estate settlement services and/or products for the Term of the Franchise Agreement;

B.    For Complainants costs in this action, including its reasonable attorney's fees, and pre- and post judgment interest.

## COUNT V

### (Federal Trademark Infringement, 15 U.S.C. § 1114)

37.    GMACRE re-alleges and incorporates herein by reference paragraphs 1 through 36 of this Demand as if fully set forth herein.

38.    GMACRE, through it's parent entity, has been and is now the owner of all right, title, interest and good will in and to the trademarks, service marks and logos utilized to identify its services to the public, including but not limited to the "GMAC" service mark and a mark consisting of a logo comprised of a design of two trees and the outline of a house (the "double tree and house logo"), hereinafter referred to as the "Registered Marks." Since at least 1977, GMACRE, including through its predecessors in interest, has continuously used the Registered Marks to identify its services to the public.

39.    From 1977 to the present, GMACRE, both for itself and through its predecessors in interest, has generated substantial revenues from its real estate services and has spent substantial sums in advertising these services using the Registered Marks.

9

40.    As a result of the extensive advertising of, and substantial revenues generated from, the services identified with the Registered Marks, such marks have become extremely well known to the public and to customers, and are a highly distinctive indication of origin. The Registered Marks further each qualify as distinctive marks under 15 U.S.C. § 1125(c).

41.    The GMAC Real Estate Mark was duly registered with the U.S. Patent and Trademark Office through U.S. Certificate of Registration Number 2612792, issued on August 27, 2002.

42.    The "double tree and house" Mark was duly registered with the U.S. Patent and Trademark Office through U.S. Certificate of Registration 1241435, issued on June 7, 1983.

43.    Upon termination of the Franchise Agreement, all right and license granted to Respondents to use or display the Registered Marks was immediately terminated.

44.    Notwithstanding termination of the Franchise Agreement on July 5, 2007 and for a period of time continuing until at least August 27, 2007, Respondents each, knowingly and willfully, and with conscious and deliberate disregard of the rights of GMACRE to exclusive control over the Registered Marks, continued to aggressively and openly use and display the Registered Marks in connection with the promotion of the Signature businesses, to distribute letterhead and business cards bearing the Registered Marks, to use signage displaying the Registered Marks, to post listings of available real estate opportunities on which the Registered Marks were displayed, and to otherwise identify the Signature business to the public using the Registered Marks, all despite repeated demands from GMACRE to cease such activity following termination of the Franchise Agreement.

10

45.    Upon information and belief, Respondents derived significant profits and other benefits from the unauthorized use of the Registered Marks following termination of the Franchise Agreement.

46.    As a direct and proximate result of the conduct of Respondents, GMACRE has been damaged and will continue to be damaged in an amount to be determined according to proof.

47.    The acts of Respondents as stated above were committed willfully and intentionally, such that this an exceptional case under 15 U.S.C. § 1117(a), so as to justify an increase in the damages awarded to GMACRE by three times the initial amount, plus an award of attorneys fees and costs incurred in pursuing this action.

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.    For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondents from business conducted through use of the Registered Marks following July 5, 2007;

B.    For treble damages on account of Respondents' intentional and willful trademark infringement pursuant to 15 U.S.C. § 1117(a);

C.    For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

## COUNT VI

**(Federal False Designation of Origin/False Impression of Association, 15 U.S.C. § 1125)**

48.    GMACRE re-alleges and incorporates herein by reference paragraphs 1 through 47 of this Demand as if fully set forth herein.

11

49.     Respondents' unauthorized use of the Registered Marks in connection with the offering and provision of real estate services is a false designation of origin and a false or misleading representation of fact which is likely to cause confusion, or to cause mistake, or to deceive as to an affiliation, connection or association between GMACRE and Respondents, and is likely to cause confusion, mistake or deception as to the origin, sponsorship or approval of Respondents' services by GMACRE or conversely, GMACRE services by Respondents, all in violation of 15 U.S.C. § 1125(a).

50.     As a direct and proximate cause of Respondents' creation of a false impression of association between GMACRE and Respondents, and Respondents' use of a false designation of origin and false or misleading representation of fact in connection with Respondents' services, GMACRE has been damaged and will continue to be damaged in an amount to be determined according to proof.

51.     The acts of Respondents as stated above were committed willfully and intentionally, such that this an exceptional case under 15 U.S.C. § 1117(a), so as to justify an increase in the damages awarded to GMACRE by three times the initial amount, plus an award of attorneys fees and costs incurred in pursuing this action.

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.      For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondents from business conducted through use of the Registered Marks following July 5, 2007;

B.      For treble damages on account of Respondents' intentional and willful trademark infringement pursuant to 15 U.S.C. § 1117(a);

C.    For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

## COUNT VII

### (Federal Trademark Dilution, 15 U.S.C. § 1125)

52.    GMACRE realleges and incorporates herein by reference paragraphs 1 through 51 of this Demand, as if fully set forth herein.

53.    Respondents' infringing use of the Registered Marks occurred long after the Registered Marks became famous and has caused and will continue to cause dilution of the distinctive quality of the Registered Marks in violation of 15 U.S.C. § 1125(c).

54.    As a direct and proximate result of Respondents' unlawful activities, GMACRE has been damaged and will continue to be damaged by Respondents' dilution of the GMAC Real Estate Mark pursuant to 15 U.S.C. § § 1116(a) and 1125(c), in amounts to be determined according to proof.

55.    The acts of Respondents as stated above were committed willfully and intentionally, such that this an exceptional case under 15 U.S.C. § 1117(a), so as to justify an increase in the damages awarded to GMACRE by three times the initial amount, plus an award of attorneys fees and costs incurred in pursuing this action.

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.    For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondents from business conducted through use of the Registered Marks following July 5, 2007;

B.    For treble damages on account of Respondents' intentional and willful trademark infringement pursuant to 15 U.S.C. § 1117(a);

C.    For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

<u>COUNT VIII</u>

**(Common Law Trademark Infringement)**

56.    GMACRE realleges and incorporates herein by reference paragraphs 1 through 55 of this Demand, as if fully set forth herein.

57.    Respondents' infringing use of the Registered Marks has caused confusion, mistake and/or deception and caused the public to believe that the services offered by Respondents are the same as those of GMACRE, or that such services were authorized, endorsed, sponsored or approved by GMACRE, or that Respondents were or is connected or associated with GMACRE.

58.    Respondents' infringing use of the Registered Marks constitutes willful and deliberate infringement of GMACRE common-law service mark.

59.    As a direct and proximate result of Respondents' unlawful activities, GMACRE has been damaged and will continue to be damaged in amounts to be determined according to proof.

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.    For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondent from business conducted through use of the Registered Marks following July 5, 2007;

14

B.     For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

## COUNT IX

### (Deceptive Trade Practices)

60.     GMACRE realleges and incorporates herein by reference paragraphs 1 through 59 of this Demand, as if fully set forth herein.

61.     The acts of Respondents constitute unlawful and deceptive trade practices, in that Respondents knowingly made false representations as to affiliation, connection or association with GMACRE, in violation of the Florida Deceptive and Unfair Practices Act.

62.     As a direct and proximate result of Respondents' unlawful activities, GMACRE has been damaged and will continue to be damaged in amounts to be determined according to proof.

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.     For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondent from business conducted through use of the Registered Marks following July 5, 2007;

B.     For damages in the amount of $10,000 per violation;

C.     For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

## COUNT X

### (Breach of Contract – Franchise Agreement, Use of Marks)

15

63.    GMACRE realleges and incorporates herein by reference paragraphs 1 through 62 of this Demand, as if fully set forth herein.

64.    At all times mentioned, GMACRE performed and honored all obligations and conditions required of it under the Franchise Agreement and was and is entitled to the full benefit of performance by Respondents.

65.    Respondents have breached the Franchise Agreement by, among other things, failing to cease use of the Registered Marks, and failing to provide reports of business activity for the period prior to the termination of the contract.

66.    As a direct and proximate result of the Respondents' breach, GMACRE has been damaged in amounts to be determined according to proof.

67.    GMACRE is entitled to all attorneys fees and costs incurred in connection with this action pursuant to the written terms of the Franchise Agreement.

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.    For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondents from business conducted through use of the Registered Marks following July 5, 2007;

B.    For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

## COUNT XI

### (Accounting)

68.    GMACRE realleges and incorporates herein by reference paragraphs 1 through 67 of this Demand, as if fully set forth herein.

16

69.　　GMACRE is entitled to an accounting from Respondents for all activity conducted by the business for the period prior to termination for which Respondents failed to furnish required reports, plus the period following termination of the Contract through the period during which Respondents were continuing to use the Registered Marks, pursuant to Section 13 of the Franchise Agreement.

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.　　For an accounting for all activity conducted by the business for the period prior to termination for which Respondents failed to furnish required reports, plus the period following termination of the Contract through the period during which Respondents were continuing to use the Registered Marks.

B.　　For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondents from business conducted through use of the Registered Marks following July 5, 2007;

C.　　For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

Respectfully submitted,

By: Thomas F. Falkenberg
One of the Attorneys for Plaintiff

Thomas F. Falkenberg
Eric R. Lifvendahl
Williams Montgomery & John Ltd.
20 North Wacker Drive
Suite 2100
Chicago, IL 60606

17

(312) 442-3200

Document #: 751750

18

08CV3950
JUDGE ZAGEL
MAGISTRATE JUDGE COLE
EDA

# EXHIBIT C

# American Arbitration Association

Case No. 51 115 Y 01274 07          GMAC Real Estate, LLC,

<div align="right">Claimant</div>

<div align="center">and</div>

Signature Realty & Development, Inc. and
M. Susan McIntyre,

<div align="right">Respondents</div>

## AWARD of ARBITRATOR

This matter came on for hearing by agreement of the parties on May 19 and 20, 2008, before Arbitrator Gary W. Leydig. Appearing at the hearing for the Claimant was attorney Eric R. Lifvendahl. Also appearing and testifying for the Claimant were Mr. Ed Cook and Mr. Dan Schwer. Appearing and testifying for the Respondents was Ms. Susan McIntyre. Ms. McIntyre is the President and principal owner of Signature Realty & Development, Inc.. Assisting Ms. McIntyre in the presentation of her case was her husband, Mr. Tom McIntyre. Mr. McIntyre also testified on behalf of the Respondents. Respondents' attorney, Patrick McGee, did not attend or participate in the hearing. Respondent Jan Walker had been previously voluntarily dismissed from the case.

Claimant had filed an eleven count claim in this matter. At the conclusion of the hearing, the Claimant voluntarily withdrew Counts V through XI.

Both sides were given the opportunity to fully present their claims and defenses, and the Arbitrator heard testimony and received documents from both sides on the issues presented. More particularly, the Arbitrator heard the testimony of Messrs. Cook, Schwer and McIntyre and Ms. McIntyre. The Arbitrator received and has reviewed the Claimant's Exhibits A-O, Q, R and X; and the Respondents' Exhibits 1-28. The Arbitrator has reviewed all the papers submitted to



EXHIBIT

C

the AAA by the parties in this matter, with the exception of the Respondents' counterclaim. The counterclaim was not allowed to proceed by the AAA due to the Respondents' failure to pay the required fees associated therewith. Notwithstanding the absence of a formal counterclaim, the Arbitrator did allow the Respondents to present evidence and argue at the hearing those same matters (as described in the Prehearing Brief of Respondents) not as a counterclaim but in the nature of an affirmative defense.

The Arbitrator has also reviewed the parties' post-hearing submissions.

This matter came before the Arbitrator on claims arising out of alleged breaches of ten GMAC Real Estate Franchise Agreements (Exs. A-J) entered into between Claimant, GMAC Real Estate, LLC ("GMAC") and Respondent, Signature Realty and Development, Inc. ("Signature") in connection with ten separate franchise locations in Florida. The franchise agreements contain cross-default agreements; causing a default under any one of the franchise agreements to cause a breach of all the agreements. Concurrently with the execution of the franchise agreements on March 18, 2005, Signature executed a "Franchise Development Costs Note"(the "Note") in the principal amount of $248,736.80. The monthly rate of interest under the Note is the *Wall Street Journal* prime rate, plus two percent. The Note is attached to the franchise agreement as Exhibit B. It also is separately marked as the Claimant's Exhibit M. Concurrently with the execution of the franchise agreements and the Note, the president of Signature, Susan McIntyre, executed an "Endorsement of Principals/Ownership Interest Holders"(the "Endorsement"). The Endorsement bound Mrs. McIntyre personally to certain of the provisions of the franchise agreements. Finally, as part of the same transaction, Mrs. McIntyre executed a "Personal Guaranty of Note", a copy of which was identified as Exhibit N.

The franchise agreements, at § 23A, call for the application of the law of the state in which the franchises are located – i.e. Florida. The authority for this matter proceeding in this arbitration forum is found at §23B of the franchise agreements. The Note and Guaranty of the Note adopt the same arbitration agreement contained in the franchise agreements.

## Count I

Count I seeks recovery of damages arising out of breaches of the franchise agreements. On March 15, 2007, GMAC gave written notice to Signature and Mrs. McIntyre that the ten franchises, collectively, were in default of payment of various monthly fees under the franchise agreements in the total amount of $88,123.08. A thirty-day cure period was extended to

2

Signature at that time. Respondents do not dispute this amount was past due. By July 5, 2007, the previous delinquency had grown to $138,466.83, plus an additional estimated balance due (for unreported and unpaid fees for the months of April and May, 2007) in the amount of $47,161.58. This latter sum was subsequently recalculated by Signature at the hearing to be $46,128.10. The Respondents do not seriously dispute the manner in which these sums were calculated; nor do Respondents dispute that they were unpaid and delinquent as of July 5, 2007. On July 5, 2007, based on these defaults and Respondents' failure to cure the defaults, GMAC formally terminated all ten franchise agreements and made demand for all amounts due and owing from Respondents to GMAC.

In defense, as already mentioned, the Respondents do not dispute the default or their failure to cure the default in connection with the above-described fees. Respondents do not blame GMAC for the creation of these defaults. They lay the blame, instead, on the serious downturn in the Florida real estate market. Rather than blame GMAC for the initial default, however, the Respondents accuse GMAC of not working with them in good faith to resolve the default situation, and further accuse GMAC of collaborating with a competing GMAC franchise that was allowed to open offices in Signature's general market area. These accusations, however, were not substantiated with any reliable or convincing evidence, and (at least as presented at the hearing) amounted to little more than speculation. The charges being made by Respondents against GMAC were very serious and required serious evidence in support of those charges. The evidence was not forthcoming in the quantum necessary to satisfy their burden of proof on their "defense" that GMAC's behavior nullified their indebtedness to GMAC.

Accordingly, I find that Signature was in default of the franchise agreements, the franchise agreements were properly terminated by GMAC on July 5, 2007, and there was due and owing to GMAC as of that date the sum of $184,594.93 ($138,466.83 plus $46,128.10) for past-due fees and charges. Pursuant to Florida law, GMAC is entitled to interest on this sum at the statutory rate of 11% per annum from July 5, 2007 to the date of this award (which turns out to be one year); i.e. $20,305.44. *See Parker v. Brinson Const. Co.*, 78 So.2d 873, 875 (Fla. Sup. Ct. 1955); *Fidelity & Guaranty Ins. Underwriters, Inc. v. Federated Dept. Stores, Inc.*, 845 So.2d 896, 903 (Fla. App. 2003); Fla. Stat. §§ 55.03 and 687.01. And *see* http://www.fldsfs.com/aadir/interest.htm for the Florida Department of Financial Services published statutory interest rates.

As part of its breach of contract claim, GMAC also seeks recovery of future lost fees that it would have recovered through the end of the term of the franchise agreements. The franchise agreements were to continue through February 28, 2015. Section 19B(1)(a) of the franchise agreements entitles GMAC to recover "all financial losses sustained by GMAC Real Estate as a result of the early termination (if the amount of such losses cannot be calculated exactly, they shall be estimated)." GMAC identifies three areas of future loses it seeks to recover: (1) Royalty Fees, (2) Advertising Fees, and (3) Referral Office Fees. The operative portions of the franchise agreements relating to these fees are Sections 10A, 10C and 10E, together with Exhibit A to the franchise agreements. To calculate its future damages, GMAC simply took the minimum monthly fees required under these sections and multiplied those fees out for the ten offices over the remaining ninety-three months of the franchise agreements' term. There are problems with this approach. Section 19 does not say that GMAC is entitled to recover all unpaid fees. Rather, Section 19 entitles GMAC to recover its "financial losses." I interpret this language to mean GMAC's *net* financial losses, or its lost profits under the breached agreements – i.e. its lost benefit of the bargain. GMAC's approach of simply adding up all revenue sources without taking into account the net profitability of those revenue streams results in a number that is more than its "financial losses."

The problem is that not only did GMAC not specifically segregate its financial losses, the Respondents introduced no evidence, and conducted no cross examination, to elicit a clearer picture of GMAC's financial losses. Fortunately, the franchise agreements provide insight. The Referral Office Fee is described at Section 10C as a fee "to help defray the costs of promoting GMAC Real Estate's broker to broker referral network." As thus described, this fee is not a source of profit for GMAC, but merely a fee to defray its costs. Presumably, with the termination of Signature, GMAC ceased to incur those costs as it relates to Signature and its offices. Accordingly, recovery of this particular fee for the remaining balance of the term of the agreement would be inappropriate. Similarly, the Advertising Fee, as described in Sections 10E and 14, is not intended as a source of profit for GMAC. The fee is used to fund an Advertising Fund. With the departure of the Respondent's franchise locations, those locations no longer receive any benefit from, or cause expense to, the Advertising Fund. GMAC cannot tap into that Fund to increase its profits. The lost future Advertising Fees do not represent "financial losses" for GMAC. Indeed, it is wholly discretionary with GMAC to even pursue fees not paid to the Fund. If they are pursued, GMAC has a right under Section 14 to recoup, directly from the

4

Fund, all of its costs and expenses incurred in any collection proceeding it may initiate to recover delinquent Advertising Fees. I find that the Advertising Fees do not constitute a "financial loss."

That leaves the Royalty Fees that will be unpaid over the life of the franchise agreements. While it seems unlikely GMAC realizes 100% profit on these fees, there is nothing before the Arbitrator to the contrary. Accordingly, GMAC will be awarded its lost, future Royalty Fees. Exhibit A to the franchise agreements committed Signature to pay a minimum annual Royalty Fee of $185,000.00 through February 28, 2015 – i.e., for an additional 7.75 years following the termination of the franchises in July of 2007. Over what would have been the remaining term of the franchise agreements, the lost Royalty Fees come to $1,433,750.00. This sum has to be present valued. But at what discount rate? Once again, the Respondents have failed to provide any evidence or guidance to the Arbitrator on this point, despite being specifically invited to do so. GMAC has chosen a discount rate of 4.02%, derived from the rate GMAC is charged when it borrows money from its parent corporation. That rate, however, reflects the near absence of any risk that GMAC would default on its loans to its parent corporation. The appropriate risk for determining the discount rate here should be the risk assigned to the ability of Signature, not GMAC, to pay its debts. That risk is substantially greater than the rate between GMAC and its parent corporation. This increased risk is recognized by the fact the Note contains an interest rate of prime plus two percent. In July of 2007, the *Wall Street Journal* prime rate was 8.25% (*see* http://www/wsjprimerate.us/wall_street_journal_rate_history.htm).[1] Accordingly, the Note rate at that point in time would have been 10.25%. That rate reflects a far more realistic discount rate than the one suggested by GMAC. That rate is still extremely low, however, for use in connection with a real estate brokerage business that actually went out of business in an unquestionably shaky real estate market. But, as I said, the Respondents have provided no help in determining an appropriate discount rate. For consistency, I have chosen to apply a discount of 11%. That rate is consistent with the Florida statutory interest rate and is still set at the very low end of what a reasonable discount rate should be here.

Applying the 11% discount rate to the future lost Royalty Fees generates a present value, as of July, 2007, in the amount of $933,556.00. Having been discounted as of July, 2007,

---

[1] In discounting the amount due to GMAC, it is appropriate to discount the debt back to the date of termination in July of 2007. It was on that date that the debt accrued. *See Fidelity & Guaranty Ins. Underwriters, Inc.*, 845 So.2d at 903.

however, GMAC is entitled to prejudgment interest on that discounted sum, at 11%, through the date of this award. That prejudgment interest amounts to an additional $102,691.16.

To recap, at Count I, GMAC is entitled to recover the following sums:

| | |
|---|---:|
| Unpaid pre-termination fees and charges | $184,594.93 |
| Prejudgment Interest | 20,305.44 |
| Future Royalty Fees | 933,556.00 |
| Prejudgment Interest | 102,691.16 |
| Total for Count I: | $1,241,147.53 |

## Count II

GMAC seeks recovery of principal and interest on the Note. The structure of the Note was such that if Signature was not in default under the franchise agreements, and if the franchise agreements continued through the end of their terms, the Note would be prorateably "paid off" in full without any money actually being paid by Signature to GMAC. Signature was in default, however, so GMAC seeks cash payment for the balance due. The Note and the franchise agreements must be read together. They were all executed at the same time and formed integral parts of a single transaction. The purpose of the recovery awarded under Count I is to make GMAC whole; as if the franchise agreements had been fully performed. Having been made whole through this award, GMAC is not also entitled to recover the "balance" due on the Note. That balance is effectively satisfied through the granting of the award under Count I.

## Count III

Count III seeks recovery from Mrs. McIntyre under her personal guaranty of the Note. As already determined, there will be no recovery under the Note. Therefore, there is nothing to be recovered against Mrs. McIntyre under her personal guaranty of the Note. However, Mrs. McIntyre does have personal liability arising out of the Endorsement executed by her concurrently with the franchise agreements. Under the Endorsement and Section 19B(2), GMAC is entitled to recover from Mrs. McIntyre the debt that was owing from Signature to GMAC as of the termination date (i.e., $184,594.93), plus the first year of future damages. For the same reasons discussed above, those future damages will be limited to Royalty Fees in the amount of $185,000.00. Accordingly, Mrs. McIntyre is indebted to GMAC in the total amount of $369,594.93.

6

Since this sum makes up a part of the amount awarded to GMAC under Count I, GMAC can obviously only have one recovery of this sum. All amounts recovered by GMAC against its award on Count I must be applied against the amount owed by Mrs. McIntyre, and vice versa.

The amount owing from Mrs. McIntyre became due after the first full year following the termination. Accordingly, no prejudgment interest will be awarded on this sum.

## Count IV

Count IV seeks enforcement of the franchise agreements' post-termination covenants not to compete. The covenants are facially unreasonable. They contain no geographic limitation and would persist, if enforced, for nearly eight years following the termination date. Under the circumstances of this case, and in accordance with Fla. Stat. § 542.335, the covenant is hereby rewritten so that its term is valid for twelve months from the date of the termination (i.e. through July 4, 2008) and it is further limited in geographic scope to the location of each of Signature's former offices, plus a radius of one mile (i.e., the same areas that comprised each franchise agreement's exclusive territory). GMAC has not made any reasonable showing that the covenant requires any greater duration or geographic scope than this to protect its legitimate interests.

## Attorneys' Fees and Costs

GMAC is entitled to recover its fees and costs of this arbitration in accordance with the parties' arbitration agreement. GMAC has submitted a statement of its fees and costs, to which no objection has been made by the Respondents. I have reviewed the fee entries submitted by GMAC and they appear reasonable. Accordingly, GMAC shall recover its fees and costs in the amount of $25,140.75. GMAC shall also recover all fees it has paid to the AAA in connection with this arbitration. The administrative fees and expenses of the American Arbitration Association totaling $11,250.00 and the compensation and expenses of the arbitrator totaling $8,271.25 shall be borne by Respondents.

THEREFORE,

(1) An award is entered in favor of GMAC and against Signature on Count I in the amount of $1,241,147.53;

(2) An award is entered in favor of Signature and against GMAC on Count II, and GMAC shall recover nothing on Count II;

(3)    An award is entered in favor of GMAC and against Mrs. McIntyre on Count III in the amount of $369,594.93. The same sum is included in the award granted under Count I. Accordingly, only one recovery may be had for this sum;

(4)    The covenants not to compete contained in the franchise agreements are rewritten so that they expire as of July 4, 2008. Those covenants are further rewritten so that their geographic scope is limited to the location of each of Signature's former offices plus a radius of one mile;

(5)    An award is entered in favor of GMAC and against the Respondents in the amount of $25,140.75, for GMAC's attorneys' fees and costs; and

(6)    Respondents shall reimburse GMAC the sum of $19,521.25, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by GMAC, upon demonstration by GMAC that these incurred costs have been paid.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

Dated: July 9, 2008

Gary W. Leydig, Arbitrator

8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GMAC REAL ESTATE, LLC, | ) | RECEIVED: JULY 11, 2008 |
| | ) | 08CV3950 |
| Plaintiff, | ) | JUDGE ZAGEL |
| | ) | MAGISTRATE JUDGE COLE |
| vs. | ) No. | EDA |
| | ) | |
| SIGNATURE REALTY & DEVELOPMENT, | ) | |
| INC., d/b/a SIGNATURE and d/b/a | ) | |
| SIGNATURE REAL ESTATE, and M. SUSAN | ) | |
| McINTYRE, | ) | |
| | ) | |
| Defendants. | ) | |

**PROPOSED**
**ORDER CONFIRMING ARBITRATION AWARD AND JUDGMENT**

This matter coming to be heard on Plaintiff, GMAC Real Estate, LLC's ("GMAC") Motion for Confirmation of Arbitration Award and Judgment, all parties having received notice and the Court being fully advised,

IS IT HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

1.    The Award of Arbitrator entered on July 9, 2008 by Arbitrator Gary Leydig, in American Arbitration Association Case No. 51 115 Y01274 07 is confirmed.

2.    Judgment is entered against Defendant Signature Realty & Development, Inc. d/b/a Signature and d/b/a Signature Real Estate ("Signature") and in favor of Plaintiff GMAC Real Estate, LLC in the amount of $871,552.60.

3.    Judgment is entered against Defendant M. Susan McIntyre and in favor of Plaintiff GMAC Real Estate, LLC in the amount of $369,594.93.

4.    Judgment is entered against Defendant Signature and Defendant M. Susan McIntyre jointly and severally and in favor of Plaintiff GMAC Real Estate, LLC in the amount of $44,662.

ENTERED:

By:_____
                  JUDGE

**Order Prepared By**:
Eric R. Lifvendahl
Williams Montgomery & John Ltd.
20 North Wacker Drive
Suite 2100
Chicago, IL 60606
(312) 442-3200

Document #: 780135